[No. A112964. First Dist., Div. Five. Aug. 24, 2007.]

In re GROUNDWATER CASES.

■■■■■■■■■■■■

## COUNSEL

Rose, Klein & Marias, Barry I. Goldman, David A. Rosen, Christopher P. Ridout; Engstrom, Lipscomb & Lack, Walter J. Lack, Joy Robertson, Ann A. Howitt, Richard P. Kinnan; and Gary A. Praglin for Plaintiffs and Appellants.

Lemieux & O'Neill, W. Keith Lemieux; Ropers, Majeski, Kohn & Bentley, Thomas H. Clarke, Jr., Terry Anastassiou; Ragsdale Liggett, Mary Hulett; Daniels Fine Israel & Schonbuch, Paul R. Fine; Waller Lansden Dortch & Davis, Michael K. Stagg, E. Lee Horton, William K. Koska; Bacalski & Ottoson and Gary C. Ottoson for Defendants and Respondents.

## OPINION

**JONES, P. J.**—These coordinated appeals are before us after remand from the Supreme Court's decision in *Hartwell Corp. v. Superior Court* (2002) 27 Cal.4th 256 [115 Cal.Rptr.2d 874, 38 P.3d 1098] (*Hartwell*), and they require us to determine whether the trial court properly applied the Supreme Court's holding in that case. In *Hartwell,* the Supreme Court held that Public Utilities Code section 1759 (section 1759) barred actions for damages against water purveyor defendants regulated by the California Public Utilities Commission (PUC) and arising out of exposure to contaminated drinking water where such actions challenged the adequacy of drinking water standards or sought damages for exposure to water that met applicable regulatory standards. (*Hartwell, supra,* 27 Cal.4th at pp. 276–277.) The Supreme Court allowed plaintiffs to pursue "damage claims based on the theory that the water [supplied by defendants] failed to meet federal and state drinking water standards." (*Id.* at p. 276.) It held section 1759 did not bar damages claims for exposure to water that violated those standards. (27 Cal.4th at pp. 277–278.)

The plaintiffs in the actions below appeal from the dismissal of their damages claims against two groups of water purveyor defendants—one group of defendants regulated by the PUC and another group of public entity water suppliers. Plaintiffs contend that the trial court misapplied the holding of *Hartwell.* First, they argue that the trial court adopted overly narrow definitions of the terms "federal and state drinking water standards" and "violations" as those terms were used in *Hartwell.* Second, plaintiffs claim that the trial court erred in concluding that plaintiffs had failed to identify any enactment imposing a "mandatory duty" on the public entity defendants within the meaning of Government Code section 815.6. Finally, plaintiffs contend that the trial court improperly limited their discovery. We find plaintiffs' contentions unpersuasive and accordingly affirm.

## Factual and Procedural Background

The cases now before us have a rather long and complex history. The early history is fully set forth in the Supreme Court's opinion in *Hartwell*, and we will not repeat it here. Instead, we will only summarize briefly the pre-*Hartwell* proceedings before turning to the present appeals. We refer the reader to *Hartwell* for a more detailed recitation of the early history of the case. (See *Hartwell, supra,* 27 Cal.4th at pp. 260–264.)

### *Pre*-Hartwell *Proceedings*

The genesis of the appeals now before us was a series of actions filed in 1997 and 1998 by a number of residents of Los Angeles County against four water companies regulated by the PUC, certain water companies not regulated by the PUC, and numerous corporate parties that are neither water suppliers nor regulated by the PUC. (*Hartwell, supra,* 27 Cal.4th at pp. 260–261.) By August 2002, over 2,000 plaintiffs were parties to these actions. The lawsuits alleged causes of action for negligence, strict liability, trespass, public and private nuisance, fraudulent concealment, and, in some instances, wrongful death. (*Id.* at p. 261.) The claims against the defendant water suppliers alleged that they had provided contaminated water to the plaintiffs. (*Ibid.*)

In response to the actions against the regulated utilities, on March 12, 1998, the PUC issued an order instituting investigation No. 98-03-013 because the complaints "raise public concerns over the safety of the drinking water supplies of these utilities." (Cal.P.U.C. Order Instituting Investigation No. 98-03-013 (Mar. 12, 1998) [1998 Cal.P.U.C. Lexis 73 at p. *2].) The PUC proceeding investigated a number of issues, including whether current drinking water standards adequately protect public health and safety and whether regulated utilities have complied with those standards. (1998 Cal.P.U.C. Lexis at p. *17.)

After the PUC's order instituting investigation No. 98-03-013, the defendants regulated by the PUC filed demurrers to the complaints on the ground that section 1759 deprives the superior courts of jurisdiction to review or annul any order of the PUC or to interfere in the performance of the PUC's official duties.[1] (*Hartwell, supra,* 27 Cal.4th at pp. 263–264.) One superior court sustained the PUC-regulated defendants' demurrers without leave to

---

[1] Section 1759, subdivision (a) provides: "No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law and the rules of court."

amend, and the others stayed the actions pending the completion of the PUC's investigation. (*Ibid.*)

The parties to the actions filed numerous petitions for writs of mandate with this court, which consolidated the writ proceedings with the plaintiffs' appeal from the granting of the demurrer by the PUC-regulated defendants. (*Hartwell, supra,* 27 Cal.4th at p. 264.) After we issued our opinion in the consolidated appeals, the Supreme Court granted review. (*Ibid.*)

### The Supreme Court's Decision in Hartwell

In *Hartwell,* the Supreme Court held that section 1759 barred some of the plaintiffs' claims, but not others. (*Hartwell, supra,* 27 Cal.4th at pp. 266–282.) While *Hartwell* resolved a number of legal issues, the portion of the opinion that is relevant for purposes of the appeals now before us is the court's discussion of the plaintiffs' damages claims.

In addressing those claims, the court noted that the plaintiffs' actions challenged both the adequacy of the water quality standards adopted by the Department of Health Services (DHS) and the PUC and the defendants' compliance with those standards. (*Hartwell, supra,* 27 Cal.4th at p. 276.) It concluded that the plaintiffs' challenge to the adequacy of the standards themselves was barred for two reasons. (*Ibid.*) First, "[a]n award of damages on the theory that the public utilities provided unhealthy water, even if that water actually met DHS and PUC standards, would interfere with a 'broad and continuing supervisory or regulatory program' of the PUC." (*Ibid.,* quoting *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 919 [55 Cal.Rptr.2d 724, 920 P.2d 669] (*Covalt*).) As the court explained, for the PUC to perform its regulatory functions, such as ratemaking, the agency "must have certain water quality benchmarks." (*Hartwell, supra,* 27 Cal.4th at p. 276.) "For example, in determining whether to approve a rate increase, the PUC must consider whether a regulated water utility's existing revenues are adequate to finance any water treatment facility that may be needed. Whether a treatment facility is needed, and, if so, the expense thereof, cannot be determined except with reference to an applicable water quality standard. General order No. 103, promulgated by the PUC in 1956, formally adopted the DHS water quality standards as its own. Thus, the DHS standards serve as those benchmarks. A superior court determination of the inadequacy of a DHS water quality standard applied by the PUC would not only call DHS regulation into question, it would also undermine the propriety of a PUC ratemaking determination." (*Ibid.*)

Second, the Supreme Court explained that the PUC provided a "safe harbor" to regulated utilities if they complied with DHS standards. (*Hartwell,*

*supra,* 27 Cal.4th at p. 276.) "An award of damages on the theory that the public utilities provided unhealthy water, even if the water met DHS standards, 'would plainly undermine the commission's policy by holding the utility liable for not doing what the commission has repeatedly determined that it and all similarly situated utilities were not required to do.' (*Covalt, supra,* 13 Cal.4th at p. 950.)" (*Hartwell, supra,* 27 Cal.4th at p. 276.) The court thus held that section 1759 barred any action claiming damages from water that complied with DHS standards. (*Hartwell,* at p. 276.)

But the Supreme Court also held that damages claims based on the theory that the water failed to meet federal and state drinking water standards were not barred. (*Hartwell, supra,* 27 Cal.4th at p. 276.) Such claims would not interfere with the PUC's regulatory policy of requiring water utility compliance with DHS standards. (*Ibid.*) Plaintiffs could thus seek relief for past violations of those standards without interfering with the PUC's implementation of its supervisory and regulatory policies. (*Id.* at p. 277.) As the court explained, "a jury award supported by *a finding that a public water utility violated DHS and PUC standards* . . . would not hinder or frustrate the PUC's declared supervisory and regulatory policies . . . ." (*Id.* at pp. 277–278, italics added.) A jury verdict in such an action therefore would not be barred by section 1759. (27 Cal.4th at p. 278.) Although the Supreme Court thus allowed the plaintiffs' damages actions to proceed to the extent they were based on the theory that the water supplied "violated DHS and PUC standards," *Hartwell* did not define with precision either what standards applied or what constituted a violation of those standards.

The Supreme Court then remanded the case for further proceedings. (*Hartwell, supra,* 27 Cal.4th at p. 283.)

### *The Parties to the Present Appeal*

The appellants in the appeals now before us are plaintiffs in three sets of actions. After remand from the Supreme Court in *Hartwell,* the three sets of actions were coordinated pursuant to a case management order and designated Judicial Council Coordination Proceeding No. 4135.[2] As of August 28, 2002, the date of the initial case management order, the actions involved over 2,000 plaintiffs. The "master complaints" filed by plaintiffs in all three actions alleged that plaintiffs or their decedents had been injured by the delivery of

---

[2] Each grouping of actions is referred to by the name of one of the plaintiffs. At the time of the initial case management order, the so-called *Abarca* Cases (Super. Ct. L.A. County, No. KC027795) consisted of seven individual actions involving water in the Pomona Valley. The "*Santamaria* Cases" (Super. Ct. L.A. County, No. KC025995) consisted of six actions involving water in the San Gabriel Valley. The "*Adler* Cases" (Super. Ct. L.A. County, No. KC169892) consisted of eight cases also involving water in the San Gabriel Valley.

well water contaminated by various substances. Specifically, plaintiffs alleged that through ingestion, inhalation, and dermal contact with the contaminated water, either they or their decedents were exposed to 12 "hazardous contaminants"—trichloroethylene (TCE), tetrachloroethylene (PCE), carbon tetrachloride (CTC), hexavalent chromium, perchlorate, 1,1,1-trichloroethane (1,1,1-TCA), 1,1-dichloroethylene (1,1-DCE), vinyl chloride, nitrosodimethylamine (n-DMA), 1,4-dioxane, benzene, and nitrates.[3] All of the actions alleged personal injury, wrongful death, and/or property damage resulting from this exposure.

The defendants who are parties to these appeals are suppliers of water. They include water purveyor companies regulated by the PUC (hereafter the PUC-Regulated Defendants).[4] The defendants also included public entity water purveyors (hereafter the Public Entity Defendants).[5] Both the PUC-Regulated Defendants and the Public Entity Defendants are alleged to have provided contaminated drinking water to plaintiffs.

### The Trial Court's Four-phase Proceeding

In light of *Hartwell*'s holding concerning the jurisdictional bar imposed by section 1759, the trial court adopted a four-phase pretrial review to determine the scope of its subject matter jurisdiction, if any, over the coordinated actions. Phase I dealt with two legal issues—(1) what "standards" should apply to the PUC-Regulated Defendants under *Hartwell*, and (2) the applicable mandatory duties, if any, of the Public Entity Defendants under Government Code section 815.6.[6] In phase II, the trial court determined what constituted a "violation" for purposes of *Hartwell*. In phase III, the parties conducted discovery to determine whether the various defendants had committed such "violations." Finally, in phase IV, the parties filed dispositive motions based on the *Hartwell* decision.

---

[3] It is not entirely clear when this exposure is alleged to have begun. Plaintiffs' opening brief on appeal alludes to water contamination beginning in the 1940's. Discovery in the court below, however, appears to have focused on the period between January 1, 1955, and September 1, 1998.

[4] The PUC-Regulated Defendants who are parties to the appeal before us are Suburban Water Systems, Southwest Water Company, California-American Water Company, and Southern California Water Company.

[5] The Public Entity Defendants who are parties to the appeal before us are San Gabriel County Municipal Water District, Valley County Water District, and the City of Pomona.

[6] Government Code section 815.6 provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

On April 28, 2003, the trial court issued its phase I statement of decision. With respect to the "standards" applicable to the PUC-Regulated Defendants, the trial court held that "[t]he 'numerical standards' the Court will recognize in applying the *Hartwell* decision will be those adopted by the Department of Health services (DHS) as 'maximum contaminant levels' (MCLs) and 'action levels' (ALs), and prior to the adoption of MCLs/ALs[,] those numerical standards adopted by the DHS or any predecessor or similar agency, whether state or federal[,] to the extent the numerical standards adopted by such agency were properly incorporated in California's regulatory scheme. The Court will not apply any qualitative standard, such as 'potable, healthful, or wholesome' for any period of time, as to do so would prospectively undermine the regulatory scheme."

On the mandatory duty issue, the trial court noted that it had previously sustained the Public Entity Defendants' demurrer to the plaintiffs' mandatory duty claim without leave to amend. Quoting its earlier ruling, the trial court noted that it had offered the plaintiffs the opportunity to have their mandatory duty causes of action reinstated " '[t]o the extent Plaintiffs are successful in identifying specific statutes, regulations or ordinances that create a mandatory duty on the Public Entity Defendants.' " The trial court held that "the general provisions of the Federal and State Safe Drinking Water Acts (respectively, 42 U.S.C. § 300f and Health & Safety Code, § 116275), and Health & Safety Code, §§ 4031 and 116300, do not create a mandatory duty within the meaning of Government Code § 815.6." Despite this ruling, the trial court explained that "the DHS regulations may create a mandatory duty with respect to MCL's and AL's to the extent that plaintiffs are able to make a showing of 'violations' by the Public Entity Defendants. The determination of what constitutes a 'violation' will be made on the same grounds as necessary for imposition of liability on the PUC Regulated Defendants under *Hartwell*. The mandatory duty, if any, is compliance with the regulatory scheme embodied in the DHS regulations."[7]

After briefing from the parties, on August 25, 2003, the trial court issued its phase II statement of decision on the violations issue. The trial court found that "to constitute a violation of DHS water quality standards, Plaintiffs must establish that the PUC Regulated Defendants and the Public Entity Defendants violated the regulatory requirements of the PUC and DHS. It will be insufficient for Plaintiffs to merely demonstrate isolated exceedances of Maximum Contaminant Levels (MCLs) or Action Levels (ALs)." The trial

---

[7] On June 27, 2003, plaintiffs sought writ review of the phase I ruling in the Second District. After receipt of the plaintiffs' writ petition, the Second District recused itself, and the matter was transferred to this court. We denied plaintiffs' writ petition on July 16, 2003. The California Supreme Court denied plaintiffs' subsequent petition for review on September 10, 2003.

court explained that isolated exceedances of DHS standards would not suffice under *Hartwell* because "*Hartwell* speaks merely in terms of 'violations' of DHS water quality standards. The regulatory scheme contemplates that an exceedance is the *starting point* for the process—it is not the 'end game.' Exceedance of MCLs, and in some instances ALs, triggers a monitoring process that is designed to restore compliance . . . . Only when exceedances continue do 'violations' occur within the meaning of *Hartwell,* which violations then result in orders prohibiting the water purveyors from continuing to provide water to their customers."[8]

In phase III of the pretrial proceedings, the plaintiffs and the water purveyor defendants agreed on a proposal for the discovery to be conducted during that phase. The result of their agreement was a joint discovery proposal submitted to the trial court on October 14, 2003. The PUC-Regulated Defendants then served plaintiffs with requests for admissions that asked: "Admit that YOU have no evidence that [PUC-Regulated Defendant] VIOLATED any STANDARD for any CONTAMINANT [within a specified date range], with respect to any water at any POINT OF ENTRY to [the PUC-Regulated Defendant's] System." The Public Entity Defendants served plaintiffs with requests for admissions that were virtually identical to those served by the PUC-Regulated Defendants.

On April 28, 2004, plaintiffs responded to the requests for admissions propounded by the PUC-Regulated Defendants and the Public Entity Defendants. Plaintiffs' response to each of the requests was identical, and it admitted that "[b]ased exclusively on the Court's definition of 'VIOLATION' and 'STANDARDS' ruled upon and fully defined in its August 25, 2003 and April 28, 2003 Statements of Decision, respectively, Plaintiffs respond as follows: Admit."

In phase IV, both the PUC-Regulated Defendants and the Public Entity Defendants moved to dismiss the actions against them, arguing that the superior court lacked subject matter jurisdiction to hear plaintiffs' claims. The PUC-Regulated Defendants argued that section 1759 divested the superior court of subject matter jurisdiction to hear plaintiffs' claims. The Public Entity Defendants contended that their inherent sovereign immunity barred the actions against them, because plaintiffs had failed to show a breach of a mandatory duty within the meaning of Government Code section 815.6.

The trial court agreed with defendants. On August 4, 2004, it granted the PUC-Regulated Defendants' motion to dismiss because plaintiffs had admitted their inability to provide evidentiary support for their claims against the

---

[8] Plaintiffs filed a petition for writ of mandate from the trial court's phase II ruling on September 5, 2003. We denied the petition on October 20, 2003.

PUC-Regulated Defendants under the trial court's interpretation of the *Hartwell* decision. It also granted the Public Entity Defendants' motion to dismiss because plaintiffs had no evidence to establish a breach of a mandatory duty based on a violation of an applicable statute or regulation.

The trial court entered judgment in favor of the PUC-Regulated Defendants on September 3, 2004. The judgment in favor of the Public Entity Defendants was entered on October 21, 2004. Plaintiffs then filed timely notices of appeal.

## DISCUSSION

Plaintiffs raise four issues in this court. Their first two arguments challenge the trial court's definition of "standards" and "violation" as those terms were used in *Hartwell*. Their third claim is that the trial court erred in holding that plaintiffs had failed to identify any enactment imposing a mandatory duty on the Public Entity Defendants within the meaning of Government Code section 815.6. Finally, they assert that the trial court's ruling on the discovery permitted in phase III of the proceedings below prevented them from discovering evidence relevant to their claims. We will address these arguments in turn.

I. *Under* Hartwell, *the Drinking Water "Standards" Are the Numerical Standards Adopted by DHS and the PUC or by Predecessor Agencies.*

Plaintiffs first challenge the trial court's definition of what constitute "state and federal drinking water standards" as that phrase was used in *Hartwell*. The trial court ruled that "[t]he 'numerical standards' the Court will recognize in applying the *Hartwell* decision will be those adopted by the Department of Health Services (DHS) as 'maximum contaminant levels' (MCLs) and 'action levels' (ALs), and prior to the adoption of MCLs/ALs[,] those numerical standards adopted by the DHS or any predecessor or similar agency, whether state or federal[,] to the extent the numerical standards adopted by such agency were properly incorporated in California's regulatory scheme. The Court will not apply any qualitative standard, such as 'potable, healthful, or wholesome' for any period of time, as to do so would prospectively undermine the regulatory scheme."

Plaintiffs contend that the trial court erred in applying these numerical standards. They claim that, over the years, California's regulation of drinking water has relied on "non-numerical qualitative public health standards, as well as numerical or MCL standards." According to plaintiffs, "[t]hese laws, regulations and policies collectively provide 'that the operator of a public water system is charged with a *mandatory duty* to provide a reliable and

adequate supply of pure, wholesome and potable water.' " Put simply, plaintiffs assert that drinking water laws and regulations predating the adoption of numerical standards for specific contaminants employed "qualitative" standards. These so-called qualitative standards typically required that water suppliers provide water that is "pure" or "wholesome, potable, and healthful."[9] Plaintiffs contend that these enactments provide a standard that may be applied to determine the liability of defendants. For the reasons that follow, we disagree.

### A. *Standard of Review*

Our resolution of this issue turns, in significant part, on our interpretation of the Supreme Court's opinion in *Hartwell.* The interpretation of the language of a judicial opinion is a legal determination, and it is therefore subject to de novo review. (See *Schering Corp. v. Ill. Antibiotics Co.* (7th Cir. 1995) 62 F.3d 903, 908.) De novo review is also appropriate because we are called upon to construe statutes and regulations on the basis of undisputed facts. (*Lindelli v. Town of San Anselmo* (2003) 111 Cal.App.4th 1099, 1104 [4 Cal.Rptr.3d 453].)

### B. *History of Drinking Water Regulation in California*

A proper analysis of plaintiffs' arguments requires an understanding of the evolution of numerical drinking water standards in California and of the statutory and regulatory schemes intended to ensure drinking water quality. We will therefore set forth a brief history of drinking water regulation in this state as it pertains to this case.

---

[9] The laws and regulations cited by plaintiffs often use slightly differing language, but most use some combination of the words "pure," "wholesome," "potable," and "healthful." (See 1 Stats. 1913, ch. 373, § 2(b), p. 795 [General Health Law requiring that "the water being supplied is the purest and most healthful obtainable or securable"]; Stats. 1947, ch. 992, § 1, pp. 2258, 2260, Health & Saf. Code, former § 4031 [prohibiting the furnishing of water for human consumption that is "impure, unwholesome, unpotable, polluted, or dangerous to health"]; Stats. 1949, ch. 949, §§ 1, 2, p. 1721, Health & Saf. Code, former §§ 4010.5 and 4011.5 [mandating compliance with waterworks standards requiring that drinking water be "obtained from a source free of pollution," "sanitary hazards," and "health hazards"]; 3 Stats. 1976, ch. 1087, § 2, pp. 4908–4909, Health & Saf. Code, former § 4010 [legislative declaration that water delivered by public water systems "be at all times pure, wholesome, and potable"]; Health & Saf. Code, § 116270, subd. (e) [chapter intended to ensure that "the water delivered by public water systems of this state shall at all times be pure, wholesome, and potable"]; see also PUC, Rules Governing Water Service, Including Minimum Standards for Design and Construction (1956) ¶ II.1.a. (hereafter cited as General Order No. 103 [utilities serving water for human consumption "shall provide water that is wholesome, potable, in no way harmful or dangerous to health"].)

### 1. *Early Numerical Drinking Water Standards*

Although the specific numerical standards for many substances found in drinking water are of relatively recent vintage, numerical drinking water standards are not new. In fact, such standards have been in force in California for decades. These standards had their antecedents in drinking water standards adopted by the United States Public Health Service (USPHS) in the early 20th century. The USPHS first adopted drinking water standards in 1914 to address bacterial contamination in drinking water. (See Bacteriological Standard for Drinking Water (Nov. 6, 1914) 29 Public Health Reports, No. 45, p. 2959.) The USPHS updated the standards in 1925 to include restrictions on certain metals and minerals in drinking water. (Report of the Advisory Com. on Drinking Water Standards (Apr. 10, 1925) 40 Public Health Reports, No. 15, pp. 693, 697, 717–718.) Further revisions of the standards were published in 1942, at which time the USPHS set limits for inorganic substances and set forth recommended methods of analysis. (Public Health Service Drinking Water Standards (Jan. 15, 1943) 58 Public Health Reports, No. 3, pp. 69–82.)

In 1946, the USPHS announced a revision of water standards for conveyances in interstate traffic. (See Water Standards for Conveyances in Interstate Traffic, 11 Fed.Reg. 1406 (Feb. 6, 1946).) These standards were then codified into federal regulations. (See 42 C.F.R. §§ 12.43–12.45a (1946 Supp.).) The USPHS regulations set forth numerical standards for both bacteriological and chemical contaminants in drinking water. (42 C.F.R. § 12.45 (1946 Supp.) [regulation of bacteriological quality of water]; 42 C.F.R. § 12.45a [regulation of physical and chemical characteristics].) As to chemical substances, the regulations set limits for lead, fluoride, selenium, and hexavalent chromium (a contaminant at issue in this case), as well as recommended concentrations for copper, iron, magnesium, zinc, chloride, sulfate, phenolic compounds, and total dissolved solids.[10] (42 C.F.R. § 12.45a(b)(1), (2).) Thus, by the 1940's, federal law had plainly established numerical standards applicable to drinking water supplied to carriers in interstate commerce.

### 2. *Adoption of the USPHS Standards in California*

In 1949, the California Legislature formally incorporated the USPHS standards into California law. In that year, the Legislature amended Health and Safety Code former sections 4010.5, 4011.5, and 4011.6 and required that

---

[10] The USPHS further amended its drinking water standards in 1962. (See Drinking Water Standards, 27 Fed.Reg. 2152 (Mar. 6, 1962), codified at 42 C.F.R. §§ 72.1–72.207 (1963 Supp.).) The 1962 standards, which addressed 26 different contaminants, revised the maximum level for hexavalent chromium and set limits on nitrate, another of the substances at issue in plaintiffs' complaints. (42 C.F.R. § 72.205(b)(1), (2) (1963 Supp.).)

both sources of water and water distribution systems "comply in all particulars" with the standards adopted by the California Section of the American Water Works Association. (Stats. 1949, ch. 949, §§ 1–3, pp. 1721–1722.) Those standards in turn required that "[t]he quality of water supplied for human consumption shall conform to Sections 3 and 4 of the United States Public Health Service Drinking Water Standards, 1946." (California Section, American Water Works Association, Standards of Minimum Requirements for Safe Practice in the Production and Delivery of Water for Domestic Use, § 4 (adopted Oct. 29, 1948).) Thus, as of the late 1940's, California had an enforceable system of numerical drinking water quality standards based on the 1946 USPHS standards.

### 3. General Order 103

In 1955, the PUC initiated an investigation proceeding "for the purpose of adopting and prescribing, by general order, uniform service standards and service rules applicable to all privately-owned, public utility water companies in the State of California." (Re Adoption of Service Standards and Service Rules for Water Utilities (1956) 55 Cal.P.U.C. 56.) The result of this investigation was General Order No. 103. (55 Cal.P.U.C. at p. 58.) The purpose of that order was "to promote good public utility practices, to encourage efficiency and economy and to establish minimum standards to be hereafter observed in the design, construction and operation of waterworks facilities by water utilities operating under the jurisdiction of the Commission." (Gen. Order No. 103, ¶ I.1.a.)

In the "Standards of Service" section of the order, the PUC required that "[a]ny utility supplying water for human consumption . . . shall comply with the laws and regulations of the state or local Department of Public Health." (Gen. Order No. 103, ¶ II.1.a.) The PUC made clear that its objective was to coordinate its exercise of regulatory jurisdiction with that of the Department of Public Health, the predecessor to DHS, and it expressly stated that "[i]t is not intended that any rule contained in this paragraph II 1 shall supersede or conflict with an applicable regulation of the State Department of Public Health. A compliance by a utility with the regulations of the State Department of Public Health on a particular subject matter shall constitute a compliance with such of these rules as relate to the same subject matter except as otherwise ordered by the Commission." (Gen. Order No. 103, ¶ II.1.a.)

General Order No. 103 thus essentially incorporated the regulations of the Department of Public Health as the PUC's drinking water standards.[11] (See

---

[11] The Legislature later acknowledged the primary role of the Department of Public Health (now DHS) in the setting of drinking water standards when it amended Public Utilities Code section 770, subdivision (b) in 1974. (1 Stats. 1974, ch. 229, § 1, p. 434.) Two years later, it

Commission's Investigation Into Drinking Water Safety (1999) 1 Cal.P.U.C.3d 91, 102 [noting that in Gen. Order No. 103, PUC "adopt[ed] as its own . . . the existing regulations of the State Department of Public Health"].) In addition, the PUC specifically required that water supplied by any utility be "[o]f such quality as to meet the United States Public Health Service Drinking Water Standards of 1946." (Gen. Order No. 103, ¶ II.1.b.(1)(c); see also Gen. Order No. 103, ¶ II.1.c. [testing of water to be carried out in accordance with the USPHS standards].) Taking language directly from the USPHS standards, General Order No. 103 mandated that "[w]ater supplied by any utility shall be: [¶] (a) Obtained from a source free from pollution; or obtained from a source adequately purified by natural agencies; or adequately protected by artificial treatment." (Gen. Order No. 103, ¶ II.1.b.(1)(a); cf. 42 C.F.R. § 12.44(a), (1)–(3) (1946 Supp.).)

4. *The Federal and California Safe Drinking Water Acts*

In 1974, Congress passed the Safe Drinking Water Act of 1974 (SDWA). (Pub. L. No. 93-523 (Dec. 16, 1974) 88 Stat. 1661, codified at 42 U.S.C. § 300f et seq.) The SDWA empowered the Environmental Protection Agency (EPA) to set standards for the control of contaminants in drinking water. (42 U.S.C. § 300g-1(b).) The SDWA establishes national primary drinking water regulations applicable to "public water systems."[12] (42 U.S.C. § 300f(1).) Under the SDWA, national primary drinking water regulations identify contaminants that may have adverse effects on human health and specify a maximum contaminant level (MCL) for such contaminants. (42 U.S.C. § 300f(1).) The EPA issued national interim primary drinking water regulations in 1975. (Environmental Protection Agency, National Interim Primary Drinking Water Regulations, 40 Fed.Reg. 59566–59588 (Dec. 24, 1975).) Pursuant to its authority under the SDWA, the EPA has since established MCL's for a wide variety of contaminants. (See 40 C.F.R. pt. 141 (2007).)

The SDWA gives states primary enforcement authority for drinking water programs provided that the states meet certain criteria, including the adoption of drinking water standards that are no less stringent than the national

again amended that section to provide: "No standard of the [PUC] applicable to any water corporation shall be inconsistent with the regulations and standards of the State Department of Health . . . ." (3 Stats. 1976, ch. 1087, § 4, p. 4929.)

[12] The SDWA defines a "public water system" as "a system for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has at least fifteen service connections or regularly serves at least twenty-five individuals." (42 U.S.C. § 300f(4)(A).)

primary drinking water regulations promulgated by the EPA.[13] (42 U.S.C. § 300g-2(a)(1)–(6); 40 C.F.R. § 142.10 (2007).) Under the system of state primary enforcement, a utility's compliance with the state standards thus necessarily constitutes compliance with EPA standards. (See Health & Saf. Code, § 116287, subds. (a)–(c).)

■ Two years after the enactment of the SDWA, the Legislature passed the California Safe Drinking Water Act. (3 Stats. 1976, ch. 1087, pp. 4908–4930, formerly codified at Health & Saf. Code, § 4010 et seq., presently codified at Health & Saf. Code, § 116270 et seq.) The California act gave DHS the authority to promulgate "primary drinking water standards" and required that those standards "shall in no case be less stringent than those set by the United States Environmental Protection Agency pursuant to the [SDWA]."[14] (Stats. 1976, ch. 1087, § 2, p. 4914, adding Health & Saf. Code, former § 4026; see Health & Saf. Code, § 116365, subd. (a).) Primary drinking water standards include MCL's for contaminants that, in the judgment of DHS, may have an adverse effect on the health of persons. (Health & Saf. Code, § 116275, subd. (c)(1).) They also include treatment techniques and monitoring and reporting requirements as specified by DHS. (Health & Saf. Code, § 116275, subd. (c)(2), (3).)

The California SDWA requires DHS to set each primary drinking water standard at a level that is as close as possible to the "public health goal" (PHG) for a given contaminant. (Health & Saf. Code, § 116365, subd. (a).) A PHG is an "estimate of the level of the contaminant in drinking water that is not anticipated to cause or contribute to adverse health effects, or that does not pose any significant risk to health." (Health & Saf. Code, § 116365, subd. (c)(1).) The statute requires that PHG's be based exclusively on public health considerations. (Health & Saf. Code, § 116365, subd. (c)(1).) In contrast, in setting the primary drinking water standard itself, DHS must

---

[13] In February 1978, California applied to the EPA to assume primary enforcement responsibility under the SDWA. (Environmental Protection Agency, Approval of State Application for California Drinking Water Primacy Enforcement Responsibility, 43 Fed.Reg. 8029 (Feb. 27, 1978).) The EPA approved California's application in June of that year, granting primary enforcement responsibility for public water systems to the state. (Environmental Protection Agency, State of California Primary Enforcement Responsibility: Final Determination, 43 Fed.Reg. 25180 (June 9, 1978).) Because California has been granted primacy by the EPA, there is no need in this case to discuss federal drinking water standards separately from those set by the state.

[14] Under the California SDWA, "primary drinking water standards" are defined as "(1) Maximum levels of contaminants that, in the judgment of the department, may have an adverse effect on the health of persons. [¶] (2) Specific treatment techniques adopted by the department in lieu of maximum contaminant levels pursuant to subdivision (j) of Section 116365. [¶] (3) The monitoring and reporting requirements as specified in regulations adopted by the department that pertain to maximum contaminant levels." (Health & Saf. Code, § 116275, subd. (c)(1)–(3).)

consider not only the PHG and the EPA's national primary drinking water standard for the contaminant, but also the "technological and economic feasibility of compliance with the proposed primary drinking water standard." (Health & Saf. Code, § 116365, subd. (b)(1)–(3).) Thus, DHS's setting of primary drinking water standards involves a balancing of public health concerns with questions of technological feasibility and cost.

Acting on this authority, DHS has over the years set MCL's for numerous substances, including most of those at issue in this case. For example, in 1977, DHS set MCL's for both chromium and nitrate. (Cal. Admin. Register 77, No. 45-C, p. 1708.) In 1989, DHS set MCL's for PCE, 1,1,1-TCA, TCE, 1,1-DCE, and benzene. (Cal. Reg. Notice Register 88, No. 22-Z, pp. 1826–1828, 1829–1831.) Today, nine of the 12 contaminants at issue in plaintiffs' complaints have established MCL's. (Cal. Code Regs., tit. 22, § 64431, subd. (a) [chromium and nitrate]; § 64444 [benzene, CTC, 1,1-DCE, PCE, 1,1,1-TCA, TCE, vinyl chloride].) Three others—1,4-dioxane, n-DMA, and perchlorate—currently have no MCL's.

As this history makes clear, California has imposed enforceable, numerical drinking water standards since the 1940's. Over the years, as scientific knowledge has advanced, the standards have become ever more comprehensive and increasingly stringent. Whereas the first drinking water standards regulated only a few specified contaminants, today's standards regulate a far greater number, a number that will likely grow larger if present trends continue. What is significant for our purposes is that, at the direction of the Legislature, the PUC and DHS have been regulating in this area since the mid-20th century. It is to these agencies that the Legislature has entrusted the primary responsibility for protecting the public's supply of drinking water.

### C. *The Drinking Water Standards Referred to in* Hartwell *Are the Numerical Standards Adopted by DHS and the PUC.*

Turning to plaintiffs' challenge to the trial court's definition of "standards," we reject plaintiffs' argument that terms such as "pure, wholesome, and potable" can furnish a standard for assessing the potential liability of defendants. As we shall explain, plaintiffs' proposed "standards" are at odds with *Hartwell,* in conflict with the statutory scheme, and unenforceable as a practical matter.

#### 1. *Plaintiffs' Arguments Are Inconsistent with* Hartwell.

At the outset we note that plaintiffs concede that "once a MCL, AL or predecessor numerical standard is established by the DHS for a particular pollutant, that numerical standard constitutes the enforceable drinking water

quality standard for that pollutant in a suit for damages pursuant to *Hartwell* and/or the California Tort Claims Act." Thus, plaintiffs agree that the numerical standards govern once DHS establishes such a standard for a given pollutant. Plaintiffs argue nevertheless that until a numerical standard is established, they should be permitted to pursue damages claims arising out of the provision of water contaminated by such a pollutant on the grounds that the water was therefore unhealthful or unsafe.

Here, plaintiffs' argument runs afoul of *Hartwell. Hartwell* made quite clear that, to the extent that the plaintiffs' actions challenged the adequacy of the regulatory standards established by the PUC or DHS, the actions were barred. (See *People ex rel. Orloff v. Pacific Bell* (2003) 31 Cal.4th 1132, 1147 [7 Cal.Rptr.3d 315, 80 P.3d 201] (*Orloff*) [explaining that *Hartwell* barred "challenges . . . to the adequacy of those standards, and claims for damages allegedly caused by unhealthy water permitted by the standards . . ."].) As the *Hartwell* court explained, "[a]n award of damages on the theory that the public utilities provided unhealthy water, even if that water actually met DHS and PUC standards, would interfere with a 'broad and continuing supervisory or regulatory program' of the PUC." (*Hartwell, supra,* 27 Cal.4th at p. 276, quoting *Covalt, supra,* 13 Cal.4th at p. 919.) Plaintiffs seek to impose liability on the PUC-Regulated Defendants for providing water allegedly contaminated with substances which, at the time of the contamination, were unregulated by DHS or the PUC. Plaintiffs candidly admit that they seek to have courts and juries decide what constitutes a "healthful" level of any contaminant for which the regulatory agencies have not established an MCL. As plaintiffs' counsel explained at a hearing in the court below, for the period prior to the establishment of numerical standards for a given contaminant, "what's unhealthful or healthful during that period of time, really comes down to a question of fact on what was known and who knew it." Plaintiffs proposed to have expert witnesses define "what was healthful and what was not healthful during those periods of time." At oral argument in this court, counsel for the *Adler* plaintiffs explained that plaintiffs' proof would take historical data and "model it" to determine the level of contaminants in the water at a given point in the past and "then you compare that to the modern-day MCL's." Since plaintiffs allege contamination dating back to the 1940's or 1950's, presumably this would entail expert testimony on what constituted acceptable levels of contamination in drinking water for the past 50 or 60 years based upon, as counsel put it at oral argument, "what science knows today."

Regardless of how this argument is phrased, it asserts in essence that, in light of present-day knowledge, the prior water quality standards adopted by DHS and the PUC were inadequate and insufficiently protective of public health. If plaintiffs were permitted to have experts classify as "unhealthful" water that met all applicable standards in effect at the time the water was

supplied, the necessary implication of such testimony would be that the prior standards were inadequate to protect public health. Such a challenge is clearly prohibited by *Hartwell,* and for good reason. (*Hartwell, supra,* 27 Cal.4th at p. 276.)

■ We explained in the preceding part of this opinion that the Legislature has entrusted the regulation of drinking water quality to the PUC and DHS and its predecessor agencies. (See *Western States Petroleum Assn. v. State Dept. of Health Services* (2002) 99 Cal.App.4th 999, 1008 [122 Cal.Rptr.2d 117] (*Western States*) ["the Legislature delegated to [DHS] the initial and primary authority, and the corresponding responsibility, for establishing drinking water standards"]; *deAryan v. Butler* (1953) 119 Cal.App.2d 674, 681 [260 P.2d 98] ["the Legislature has delegated to the State Board of Public Health the duty and powers necessary to control and regulate the purity, potability and wholesomeness of public waters in this state"].) The PUC regulates drinking water quality in "active partnership" with DHS, using DHS's water quality standards as its own. (*Final Opinion Resolving Substantive Water Quality Issues* (2000) Cal.P.U.C. Dec. No. 00-11-014, 2000 Cal.P.U.C. Lexis 722 at p. *18 (hereafter *Substantive Water Quality Opinion*).) "Water quality standards are the product of [DHS] study and expertise." (*Coshow v. City of Escondido* (2005) 132 Cal.App.4th 687, 707 [34 Cal.Rptr.3d 19] (*Coshow*).) Permitting courts and juries to second-guess the carefully considered decisions of the regulatory agencies on technical water quality issues would flout the Legislature's policy choice to entrust such matters to DHS and the PUC. This we will not do. (See *Western States, supra,* 99 Cal.App.4th at p. 1008 [courts must respect the Legislature's delegation of authority to DHS to establish drinking water standards].)

In short, we cannot permit courts and juries to "reweigh the various factual and policy considerations that went into the [regulatory agencies'] determination" on water quality standards.[15] (*Western States, supra,* 99 Cal.App.4th at p. 1008; accord, *Coshow, supra,* 132 Cal.App.4th at p. 707.) Allowing the superior court to entertain damages claims based on the theory that water delivered by defendants that met DHS and PUC standards was "unhealthful" would permit the superior court "to review, reverse, correct, or annul" orders and decisions of the PUC and would "interfere with the commission in the performance of its official duties." (§ 1759, subd. (a).) Section 1759 divests the superior court of jurisdiction over such actions.

---

[15] As noted earlier, the factual and policy considerations that DHS must take into account involve both issues of public health as well as matters of cost and technical feasibility. (Health & Saf. Code, § 116365, subd. (b).) For its part, the PUC must ensure that Californians have access to an adequate supply of healthful water at an affordable cost. (Pub. Util. Code, § 739.8, subd. (a).) "Thus, in setting rates at affordable levels, the PUC must balance the quality and cost of water services." (*Hartwell, supra,* 27 Cal.4th at p. 273.)

In addition, as should be clear, acceptance of plaintiffs' argument would also create open-ended *future* liability for the PUC-Regulated Defendants. If one were to take plaintiffs' reasoning to its logical conclusion, then water purveyors regulated by DHS and the PUC might be held liable in the future for the water they are currently supplying if the regulatory agencies should *later* determine that contaminants that are unregulated today present a danger to human health. Such liability might attach even if the water provided were in full compliance with all current federal, state, and local regulations. Allowing a court to impose liability on PUC-regulated water suppliers who supplied water that complied with then current standards would deprive the PUC-Regulated Defendants of the "safe harbor" provided to public utilities that comply with DHS standards. (*Hartwell, supra,* 27 Cal.4th at p. 276.) "An award of damages on the theory that the public utilities provided unhealthy water, even if the water met DHS standards, 'would plainly undermine the commission's policy by holding the utility liable for not doing what the commission has repeatedly determined that it and all similarly situated utilities were not required to do.' " (*Ibid.,* quoting *Covalt, supra,* 13 Cal.4th at p. 950; accord, *Orloff, supra,* 31 Cal.4th at p. 1147.)

### 2. Plaintiffs' "Qualitative Standards" Are Merely Statements of Legislative Policy Regarding Drinking Water Quality.

Plaintiffs argue that statutory and regulatory statements that drinking water should be "pure" or "wholesome" or "obtained from a source free from pollution" provide an enforceable standard against which to judge the liability of water suppliers for periods during which no numerical standards existed for certain specified pollutants. But it is plain that the provision of "pure, wholesome, and potable" water is only the goal or objective of California's system of drinking water regulation. In the first section of the California SDWA, the Legislature has declared that "[t]his chapter is intended to ensure that the water delivered by public water systems of this state shall at all times be pure, wholesome, and potable. This chapter provides the *means* to accomplish this *objective*." (Health & Saf. Code, § 116270, subd. (e), italics added.) Subdivision (g) of that section declares the Legislature's intent to "establish a drinking water regulatory program within the State Department of Health Services . . . and to give the establishment of *drinking water standards* and public health goals greater emphasis and visibility within the state department." (Health & Saf. Code, § 116270, subd. (g), italics added.) It is therefore apparent that the California SDWA distinguishes between the objective of "pure, wholesome, and potable" water and the "establishment of drinking water standards," which are the means to accomplish that objective.

Courts interpreting this language agree that "[t]hese declarations set forth legislative objectives and do not themselves establish drinking water standards." (*Western States, supra,* 99 Cal.App.4th at p. 1011.) Thus, "[t]he

legislative *goal* of the SDWA to provide California's citizens with pure and safe drinking water requires [DHS] to adopt *standards* for contaminants in drinking water . . . ." (*Coshow, supra,* 132 Cal.App.4th at p. 713, italics added.) Construing an earlier version of the California SDWA, the court in *Paredes v. County of Fresno* (1988) 203 Cal.App.3d 1 [249 Cal.Rptr. 593] explained that " '[p]ure, wholesome, healthful, and potable' water is not a drinking water standard under the Pure Water Law, but rather the *objective* of the state's Pure Water Law. [Citation.]" (*Id.* at p. 12.) The "qualitative standards" on which plaintiffs rely are therefore only the Legislature's recitation of its policy objective of providing pure, wholesome, and potable water. They are not "standards" by which the actions of defendants may be judged.[16]

### 3. *No Water Provider Is Capable of Supplying "Pure" Water.*

■ Finally, for entirely practical reasons, terms like "pure" cannot provide a standard by which water suppliers may be judged. As the PUC itself has explained, "no drinking water source could meet the definition of 'pure' water, that is a collection of molecules each of which has two hydrogen and one oxygen atoms." (*Substantive Water Quality Opinion, supra,* (2000) Cal.P.U.C. Lexis 722 at p. *23.) Although there are many drinking water sources that meet drinking water standards and need no treatment before delivery to the public (*ibid.*), "few, if any, water supplies are entirely clear of a broad range of contaminants." (*Western States, supra,* 99 Cal.App.4th at p. 1015.) Thus, to impose liability on water suppliers for failing to provide "pure" water would impose on them a standard impossible to achieve. For the same reason, terms such as "pure" are merely expressions of legislative or public policy goals and not objective standards by which the performance and liability of water suppliers can be measured.

---

[16] Plaintiffs' argument that the PUC has relied on nonnumerical standards to regulate the quality of drinking water supplies is unfounded. The cases they cite are clearly distinguishable. For example, plaintiffs contend that in *San Martin Water Works* (1977) 82 Cal.P.U.C. 595, the PUC "relied on its nonnumerical authority to prevent 'unsafe' service and ordered a regulated water utility to reactivate chlorination treatment." In fact, the PUC ordered the utility to "resume regular chlorination *to the standard set by the County Health Department.*" (*Id.* at p. 603, italics added.) It therefore appears that the PUC relied not on nonnumerical standards but on chlorination standards set by local health authorities. Nor does *Larkfield Water Co.* (1972) 73 Cal.P.U.C. 258 support plaintiffs' position. The PUC there ordered the utility to take steps to reduce the amount of iron and manganese in its water. (*Id.* at pp. 271–272.) But at the time, these contaminants were already regulated under California law, since the 1962 USPHS revised drinking water standards set a limit on each of these substances (see 42 C.F.R. § 72.205(b)(1) (1963)), and California law required compliance with those standards. The PUC was not, therefore, relying on any nonnumerical standard. Finally, the California Railroad Commission's decision in *Hillsborough Water Company* (1931) 36 C.R.C. 670 deals with the turbidity of the water supplied by the utility, rather than with contamination by any particular substance, and merely states that the utility is under a duty to provide potable water for human consumption. (*Id.* at p. 672.)

II. *Under* Hartwell, *"Violations" of Federal and State Drinking Water Standards Require Noncompliance with the Statutory and Regulatory Scheme.*

Plaintiffs next contend that the trial court erred by limiting actionable "violations" authorized by our high court in *Hartwell* to those instances in which the PUC or other regulatory body had ordered the defendants to cease delivery of drinking water. Plaintiffs complain that this definition of "violations" was unduly restrictive and in conflict with *Hartwell*.[17] We disagree.

A. *Isolated Exceedances of MCL's and AL's Cannot Constitute "Violations" of Drinking Water Standards Because Both the California SDWA and DHS's Regulations Contemplate Continued Delivery of Water Despite Such Exceedances.*

■ In determining what constitutes a "violation," we turn once again to the language of *Hartwell* itself. There, the Supreme Court held that section 1759 did not preclude superior courts from "acting in aid of, rather than in derogation of, the PUC's jurisdiction." (*Hartwell, supra,* 27 Cal.4th at p. 275.) The superior courts thus have jurisdiction "to enforce a water utility's legal obligation to comply with *PUC standards and policies* and to award damages for violations." (*Ibid.,* italics added.) Such actions are not preempted by section 1759 because damage awards "based on a finding that a public water utility *violated DHS standards* would not interfere with the *PUC regulatory policy requiring water utility compliance with those standards.*" (27 Cal.4th at p. 276, italics added.) *Hartwell* therefore expressly tied the concept

---

[17] Initially, we observe that it is not clear what holding plaintiffs seek from us on this issue. Although it is evident that plaintiffs believe the trial court applied the wrong definition of "violation," they have not explained to us what they believe is the *right* definition. Plaintiffs state that "the trial court should have determined that it had jurisdiction to independently review the [Defendants'] past conduct to determine if they 'violated and exceeded federal and state drinking water standards,'" but plaintiffs do not elaborate on what would constitute a "violation" in their view. In the court below, plaintiffs argued that a "violation of federal and state drinking water standards" occurred when there was an exceedance of an MCL, AL (action level), or other numerical standard. They do not make this argument in their briefs on appeal, and the PUC-Regulated Defendants argue that it is abandoned. We would therefore be justified in treating this argument as waived. (See *Barratt American, Inc. v. City of San Diego* (2004) 117 Cal.App.4th 809, 819 [12 Cal.Rptr.3d 132] [failure of appellant to set out standards applicable to claim of preemption and to support argument with authorities justified finding of waiver]; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [76 Cal.Rptr.2d 457] [even on de novo review, appellate review limited to "issues which have been adequately raised and supported in plaintiffs' brief"]; see also Cal. Rules of Court, rule 8.204 [briefs must "support each point by argument and, if possible, by citation of authority"].) Nonetheless, we will exercise our discretion to review the violations argument that plaintiffs made below. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481] [choosing to address issue that appellant had failed to support by argument].)

of "violation" to conduct of a water utility that fails to comply with the regulatory agencies' standards and policies.

Thus, the touchstone for determining whether there has been a "violation" within the meaning of *Hartwell* is whether the PUC-Regulated Defendants have failed to comply with the regulatory standards and policies set by DHS and the PUC. When viewed in these terms, it becomes apparent that plaintiffs are mistaken in their contention that any exceedance of an MCL, AL, or other numerical standard constitutes a "violation" as that word was used in *Hartwell*.

■ Imposing liability on water suppliers for isolated exceedances of numerical standards would conflict with the regulatory system established to deal with drinking water quality. That scheme expressly permits DHS to allow water suppliers to continue to deliver water even after an MCL exceedance has been detected. Under Health and Safety Code section 116655, if DHS determines that any person has violated or is violating the SDWA, DHS has discretion to issue an order that may include a number of requirements, such as (1) the repair or alteration of the plant, works, or system, (2) the installation of purification or treatment works, (3) a change in the source of water supply, (4) a prohibition on additional service connections, (5) monitoring of the system, and (6) the submission to DHS of a report on the condition and operation of the plant, works, or system. (Health & Saf. Code, § 116655, subd. (b)(1)–(6).) This list is only illustrative and not exhaustive. (Health & Saf. Code, § 116655, subd. (b) ["An order issued pursuant to this section *may include, but shall not be limited to,* any or all of the following requirements"], italics added.)

In addition, MCL's are not rigid requirements. DHS has the authority to exempt public water systems from compliance with an MCL if the agency makes certain required findings. (See Health & Saf. Code, § 116425, subd. (a).) One of those findings is that "granting of the exemption will not result in an unreasonable risk to health." (Health & Saf. Code, § 116425, subd. (a)(3).) In such circumstances, DHS may permit a public water system to continue delivery of drinking water despite its noncompliance with an MCL. Thus, a mere exceedance of or noncompliance with a given MCL does not constitute a "violation" of the regulatory scheme.

DHS's regulations also expressly permit the continued delivery of water after detection of an MCL exceedance. For organic chemicals, if the detected level exceeds the applicable MCL, the water supplier is required to report the exceedance to DHS and to conduct further sampling. (Cal. Code Regs., tit. 22, § 64445.1, subd. (c)(5).) If an organic chemical is detected and the concentration exceeds 10 times the MCL, the water supplier must notify DHS and

conduct resampling within 48 hours to confirm the result. (Cal. Code Regs., tit. 22, § 64445.1, subd. (c)(7).) Only if the average concentration in the original and confirmation samples exceeds 10 times the MCL is the supplier required to cease delivery of water. (Cal. Code Regs., tit. 22, § 64445.1, subd. (c)(7)(B).)

Thus, both the California SDWA and DHS's regulations contemplate that water suppliers may continue to deliver water despite isolated exceedances of MCL's. Were we to permit the imposition of liability on water suppliers based upon individual exceedances of MCL's or AL's, we would expose water suppliers to damage awards for doing something that is expressly permitted by both the Health and Safety Code and by DHS and PUC regulations. Such a holding would plainly conflict with the PUC regulatory program that "provide[s] a safe harbor for public utilities if they comply with the DHS standards," and would directly contravene *Hartwell*. (*Hartwell, supra*, 27 Cal.4th at p. 276; see *Orloff, supra*, 31 Cal.4th at p. 1147 [PUC-regulated water utilities may not be held "liable for damages caused by their failure to undertake action that the PUC repeatedly had determined was not required."].)

### B. *Plaintiffs' "Any Exceedance" Argument Is Inconsistent With the Purpose for Which MCL's and AL's Are Established.*

■ Moreover, when the purpose of MCL's and AL's is taken into account, the flaw in plaintiffs' argument becomes even more apparent. MCL's and AL's are not intended to deal with "[a]cute [r]isk," which is "the potential for a contaminant . . . to cause acute health effects, i.e., death, damage or illness, as a result of a single period of exposure of a duration measured in seconds, minutes, hours, or days." (Cal. Code Regs., tit. 22, § 64400.) On the contrary, MCL's are developed for the purpose of protecting the public from possible health risks associated with *long-term* exposure to contaminants. (See *Substantive Water Quality Opinion, supra*, 2000 Cal.P.U.C. Lexis 722 at pp. *23–28.) MCL's for carcinogenic chemicals, for example, are set at a level that is expected to pose an insignificant cancer risk, a level that corresponds to a lifetime cancer risk of up to one excess case of cancer per million people exposed by drinking two liters of water per day for 70 years. (*Id.* at pp. *25–26.) Because the MCL for carcinogenic chemicals is set based on an assumption that an individual drinks two liters of water per day from a contaminated source over a 70-year lifetime, the theoretical cancer risk will very often overstate the *actual* risk, since it is unlikely that most people will drink two liters of water daily from the same contaminated source for 70 years. (See Off. of Environmental Health Hazard Assessment, A Guide to Health Risk Assessment (2001) p. 10.) Thus, "where levels of contamination are below an MCL or AL or *temporarily exceed these levels*, no health

hazard is reasonably expected to occur." (*Substantive Water Quality Opinion, supra*, 2000 Cal.P.U.C. Lexis 722 at p. *104, italics added.)

Imposing liability on water suppliers for isolated, individual exceedances of MCL's or AL's would be inconsistent with the purpose for which these limits are established. DHS sets these numerical limits to guard against the possible health risks of prolonged exposure to contaminants. To call any exceedance of an MCL or AL a "violation" would convert these numerical limits from measures designed to protect the public from long-term risks of exposure to contaminants into acute risk standards. This is simply not their intended function.

III. *The Public Entity Defendants Cannot Be Held Liable Because Plaintiffs Admittedly Have No Evidence of a Violation of Any "Mandatory Duty" for Purposes of Government Code Section 815.6.*

Plaintiffs also challenge the trial court's rulings regarding the liability of the Public Entity Defendants. We will address this challenge after summarizing the trial court's ruling and the principles that guide our review of the issue.

A. *The Trial Court's Ruling*

The trial court held that "the general provisions of the Federal and State Safe Drinking Water Acts (respectively, 42 U.S.C. § 300f and Health & Saf. Code, § 116275), and Health and Safety Code §§ 4031 and 116300, do not create a mandatory duty within the meaning of Government Code § 815.6." Despite finding that none of the statutes alleged in plaintiffs' complaints created a mandatory duty, the trial court held that "the DHS regulations may create a mandatory duty with respect to MCLs and ALs to the extent that plaintiffs are able to make a showing of 'violations' by the Public Entity Defendants. The determination of what constitutes a 'violation' will be made on the same grounds as necessary for imposition of liability on the PUC Regulated Defendants under *Hartwell*. The mandatory duty, if any, *is compliance with the regulatory scheme embodied in the DHS regulations*." (Italics added.)

The trial court's August 25, 2003 phase II ruling held that a " 'violation' of 'water quality standards' " which might show a breach of a mandatory duty "occurs when there is a failure to comply with the regulatory scheme, and not merely by isolated exceedances of an MCL." The trial court specifically rejected plaintiffs' contention that *any* exceedance of an MCL constituted a violation of applicable water quality standards. "Only when exceedances continue do 'violations' occur within the meaning of *Hartwell*, which violations then result in orders prohibiting the water purveyors from continuing to

provide water to their customers." When plaintiffs admitted that they had no evidence that the Public Entity Defendants had committed any "violations" of the relevant "standards," the trial court granted the Public Entity Defendants' motion to dismiss plaintiffs' claims.

### B. *Public Entity Liability and Standard of Review*

■ Of course there is no common law tort liability for public entities in California; such liability is wholly statutory. (*Ibarra v. California Coastal Com.* (1986) 182 Cal.App.3d 687, 692 [227 Cal.Rptr. 371] (*Ibarra*); see also *Brown v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 829 [15 Cal.Rptr.2d 679, 843 P.2d 624] ["a public entity is not liable for injuries except as provided by statute"].) Under the California Tort Claims Act, Government Code section 810 et seq., "[e]xcept as otherwise provided by statute . . . [¶] . . . [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." (Gov. Code, § 815, subd. (a).) Government Code section 815 thus "abolishes all common law or judicially declared forms of liability for public entities, except for such liability as may be required by the state or federal constitution." (Legis. Com. com., 32 West's Ann. Gov. Code (1995 ed.) foll. § 815, p. 167.)

As our Supreme Court has explained, "the intent of the [California Tort Claims Act] is not to expand the right of plaintiffs in suits against governmental entities, but to confine potential governmental liability to rigidly delineated circumstances: immunity is waived only if the various requirements of the act are satisfied." (*Williams v. Horvath* (1976) 16 Cal.3d 834, 838 [129 Cal.Rptr. 453, 548 P.2d 1125].) Sovereign immunity is the rule in California. (*Sonoma Ag Art v. Department of Food & Agriculture* (2004) 125 Cal.App.4th 122, 125 [22 Cal.Rptr.3d 468].) Consequently, the Public Entity Defendants may be held liable *only* if there is a statute subjecting them to civil liability. (See *County of Los Angeles v. Superior Court* (2002) 102 Cal.App.4th 627, 637 [125 Cal.Rptr.2d 637].) In the absence of such a statute, a public entity's sovereign immunity bars the suit. (See *Gates v. Superior Court* (1995) 32 Cal.App.4th 481, 509 [38 Cal.Rptr.2d 489].)

■ Plaintiffs claim that liability may be premised on Government Code section 815.6. That section provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." Cases interpreting this statute have noted that it establishes a three-pronged test for determining whether liability may be imposed on a public

entity: (1) the enactment in question must impose a mandatory, not discretionary, duty; (2) the enactment must be intended to protect against the kind of risk of injury suffered by the party asserting the statute as the basis of liability; and (3) the breach of duty must be a proximate cause of the plaintiff's injury. (*Ibarra, supra,* 182 Cal.App.3d at pp. 692–693.) As we shall explain, we are here concerned with the first prong of this test.

A plaintiff seeking to hold a public entity liable under Government Code section 815.6 must specifically identify the statute or regulation alleged to create a mandatory duty. (*Becerra v. County of Santa Cruz* (1998) 68 Cal.App.4th 1450, 1458 [81 Cal.Rptr.2d 165].) Once identified, determining whether the particular enactment at issue creates a mandatory duty is a question of law. (*Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 499 [93 Cal.Rptr.2d 327, 993 P.2d 983] (*Haggis*).) Because this determination is essentially a question of statutory interpretation, it is subject to de novo review. (*Creason v. Department of Health Services* (1998) 18 Cal.4th 623, 631 [76 Cal.Rptr.2d 489, 957 P.2d 1323]; *Shamsian v. Department of Conservation* (2006) 136 Cal.App.4th 621, 631 [39 Cal.Rptr.3d 62].)

To construe a statute as imposing a mandatory duty on a public entity, "the mandatory nature of the duty must be phrased in explicit and forceful language." (*Quackenbush v. Superior Court* (1997) 57 Cal.App.4th 660, 663 [67 Cal.Rptr.2d 300].) "It is not enough that some statute contains mandatory language. In order to recover plaintiffs have to show that there is some *specific* statutory mandate that was violated by the [public entity] . . . ." (*Washington v. County of Contra Costa* (1995) 38 Cal.App.4th 890, 896–897 [45 Cal.Rptr.2d 646].) Thus, "the enactment at issue [must] be *obligatory,* rather than merely discretionary or permissive, in its directions to the public entity; it must *require,* rather than merely authorize or permit, that a particular action be taken or not taken." (*Haggis, supra,* 22 Cal.4th at p. 498.) In addition, the enactment allegedly creating the mandatory duty must impose a duty on the specific public entity sought to be held liable. (*Forbes v. County of San Bernardino* (2002) 101 Cal.App.4th 48, 54 [123 Cal.Rptr.2d 721].)

With these principles in mind, we examine whether plaintiffs have satisfied the first prong of the test under Government Code section 815.6. That is, we seek to determine whether plaintiffs have identified any enactments imposing a mandatory duty on the Public Entity Defendants.

C. *None of the Enactments Identified by Plaintiffs Imposes a Mandatory Duty on the Public Entity Defendants.*

In their brief on appeal, plaintiffs argue that the trial court erred in holding that only numerical drinking water standards created mandatory duties.

According to plaintiffs, "before a numerical standard existed the various applicable provisions of California's General Health Law, California Health and Safety Code, the California Section of the American Water Works Association's Minimum Standards and the United States Public Health Service Standards served as obligatory requirements designed to promote and police drinking water quality." Plaintiffs' brief does not specifically identify the particular statutes or regulations on which they rely, but instead refers us to portions of the record containing copies of various enactments.[18] We examine those enactments to determine whether they create mandatory duties.

### 1. *The 1946 USPHS Standards*

The first enactments to which plaintiffs direct us are the 1946 USPHS drinking water standards. Plaintiffs rely upon two separate statements in those standards. They first point to language in the standards regarding the safety of water sources stating that "[t]he water supply shall be: . . . [o]btained from a source free from pollution . . . ." (42 C.F.R. § 12.44(a)(1) (1946 Supp.).) Next, plaintiffs cite the requirement that a "water supply system in all its parts should be free from sanitary defects and health hazards." (42 C.F.R. § 12.44(b) (1946 Supp.).) We do not view these regulations as imposing mandatory duties.

 First, plaintiffs take these statements out of context. Although the quoted USPHS source standard does state that the water supply shall be obtained from a source free from pollution, it is phrased in the disjunctive and also permits the use of water that is either "[o]btained from a source adequately purified by natural agencies[] or . . . [a]dequately protected by artificial treatment." (42 C.F.R. § 12.44(a)(2), (3) (1946 Supp.).) Clearly, the USPHS regulations allow water suppliers to use supplies of water if those supplies are adequately purified through either natural or artificial means. Thus, far from imposing a mandatory duty on water suppliers to obtain all water from "a source free from pollution," the USPHS standards grant water suppliers the discretion to use water that has been adequately purified or

---

[18] As noted above, plaintiffs do not support this argument in their briefs with citations to the specific statutes on which they rely. Nor do they clearly develop any argument based upon these statutes. Their failure to do so forfeits this issue on appeal. (See, e.g., *Berger v. California Ins. Guarantee Assn.* (2005) 128 Cal.App.4th 989, 1007 [27 Cal.Rptr.3d 583] [argument forfeited where parties "fail[ed] to make a coherent argument or cite any authority to support their contention"].) For the sake of completeness, however, we will review the enactments found in the record. We nevertheless take this opportunity to remind counsel that "it is entirely *inappropriate* for an appellate brief to *incorporate by reference* documents and arguments from the proceedings below . . . ." (2 Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2006) ¶ 9:30.1, p. 9-10; accord, *Banning v. Newdow* (2004) 119 Cal.App.4th 438, 455–456 [14 Cal.Rptr.3d 447].) "An appellant cannot rely on incorporation of trial court papers, but must tender arguments *in the appellate briefs*." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 109 [87 Cal.Rptr.2d 754].)

treated. The law is clear that a public entity is under no mandatory duty where it is obliged to perform a function if that function involves an exercise of discretion. (*Haggis, supra,* 22 Cal.4th at p. 498.)

The same is true of the language requiring that a water supply system be free from "sanitary defects and health hazards." The full regulation goes on to state that "all *known* sanitary defects and health hazards shall be systematically removed *at a rate satisfactory to the reporting agency and to the certifying authority*" and allows regulators to approve the use of water supplies upon a showing that the water supplier has in place rules to prohibit the introduction of unsafe liquids or chemicals into the public water supply, provisions to enforce those rules, and continuing programs to detect sanitary defects and health hazards. (42 C.F.R. § 12.44(b)(1)–(3) (1946 Supp.), italics added.)

### 2. *Former Health and Safety Code Section 4010 et seq.*

Plaintiffs next rely on the language of various former provisions of the Health and Safety Code governing water and water systems. (See Health & Saf. Code, former §§ 4016, 4021, 4022, 4031.) These sections dealt generally with the responsibilities of the Board of Health in issuing permits to water suppliers and in ensuring compliance with the waterworks standards and permit conditions. Plaintiffs appear to rely on the language in these sections that, in various, slightly different formulations seeks to ensure the provision of "pure, wholesome, potable, and healthful water" and to prohibit the furnishing of "water used or intended to be used for human consumption or for domestic purposes which is impure, unwholesome, unpotable, polluted, or dangerous to health." (Health & Saf. Code, former §§ 4016, 4031.) Contrary to plaintiffs' contentions, this language did not impose a mandatory duty on the Public Entity Defendants within the meaning of Government Code section 815.6.

As explained earlier in this opinion, words such as "pure, wholesome, and potable" are statements of the *goal* or *objective* of California's laws relating to drinking water. (*Coshow, supra,* 132 Cal.App.4th at p. 703 ["objective" of California SDWA is that water delivered by public water systems "should be at all times pure, wholesome and potable"]; *Western States, supra,* 99 Cal.App.4th at p. 1011 ["pure, wholesome, and potable" language of Health & Saf. Code, § 116270, subd. (e) sets forth "legislative objectives"]; *Paredes v. County of Fresno, supra,* 203 Cal.App.3d at p. 12, original italics [" 'Pure, wholesome, healthful, and potable' water is . . . the *objective* of the state's Pure Water Law."].) But "recitations of legislative goals and policies" do not establish mandatory duties. (*Ibarra, supra,* 182 Cal.App.3d at p. 694; see *County of Los Angeles v. Superior Court, supra,* 102 Cal.App.4th

at p. 639.) For example, in an action alleging that the state had adopted faulty standards for testing newborns for hypothyroidism, our Supreme Court held that statutory language requiring that " '[c]linical testing procedures . . . be accurate, provide maximum information, and that the testing procedures selected produce results that are subject to minimum misinterpretation' " created no mandatory duty of care. (*Creason v. Department of Health Services, supra,* 18 Cal.4th at p. 632.) Rather, such language "represents only a general principle or policy to guide the state's discretion in formulating appropriate testing and reporting standards." (*Ibid.*) Similarly, in *MacDonald v. State of California* (1991) 230 Cal.App.3d 319 [281 Cal.Rptr. 317], a statute stating that the Legislature " 'has a responsibility to ensure the health and safety of children in family homes that provide day care' " was held to be a "general declaration of policy goals" that did not impose a mandatory duty on the state to safeguard against particular injuries to children in day care. (*Id.* at p. 330.)

 Like the other Courts of Appeal that have considered the question, we conclude that the language of Health and Safety Code former section 4031 making unlawful the provision of water that is "impure, unwholesome, unpotable, polluted, or dangerous to health" is a statement of policy goals or objectives. As such, it does not impose a mandatory duty upon the Public Entity Defendants within the meaning of Government Code section 815.6.[19]

 Because we conclude that none of the statutes identified by plaintiffs in their brief to this court can be construed as creating a mandatory duty, we hold that plaintiffs have failed to state a claim against the Public Entity Defendants under Government Code section 815.6. Accordingly, the Public Entity Defendants' sovereign immunity barred the trial court from hearing plaintiffs' claims against the Public Entity Defendants, and their motions to dismiss were properly granted.

D. *Plaintiffs Have Forfeited Their Argument That the Public Entity Defendants Are Liable Because of the Existence of a Special Relationship.*

In their reply brief, plaintiffs argue that the vendor-vendee relationship between the Public Entity Defendants and plaintiffs constitutes a "special

---

[19] Plaintiffs rely on a passage in *Residents for Adequate Water v. Redwood Valley County Water Dist.* (1995) 34 Cal.App.4th 1801 [41 Cal.Rptr.2d 123] stating: "The Safe Drinking Water Act provides that the operator of a public water system is charged with a mandatory duty to provide a reliable and adequate supply of pure, wholesome and potable water." (*Id.* at p. 1806.) Their reliance is misplaced. First, the opinion does not address whether the California SDWA creates a "mandatory duty" within the meaning of Government Code section 815.6. Second, it appears that the court relied on *both* the California SDWA and its underlying regulations in describing the "mandatory duty." (34 Cal.App.4th at pp. 1806–1807.)

relationship" giving rise to liability in negligence. Plaintiffs did not raise this "special relationship" argument in their opening brief, and therefore we will not consider it. (*Schmier v. Supreme Court* (2002) 96 Cal.App.4th 873, 881 [117 Cal.Rptr.2d 497].) Basic notions of fairness dictate that we decline to entertain arguments that a party has chosen to withhold until the filing of its reply brief, because this deprives the respondent of the opportunity to address them on appeal. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764 [60 Cal.Rptr.2d 770]; accord, *American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 [13 Cal.Rptr.2d 432] ["Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument."].)

IV. *The Trial Court Did Not Abuse Its Discretion in Limiting Phase III Discovery to Instances in Which the PUC or DHS Had Ordered Defendants to Cease Delivery of Drinking Water.*

Plaintiffs' final argument is that the trial court improperly limited discovery during phase III of the proceedings below. Management of discovery lies within the sound discretion of the trial court, and we therefore review its discovery rulings under the deferential abuse of discretion standard. (*County of Los Angeles v. Superior Court* (2005) 130 Cal.App.4th 1099, 1104 [30 Cal.Rptr.3d 708].) We will set aside the trial court's ruling on a discovery matter only when it is demonstrated that there is no legal justification for the order granting or denying the discovery in question. (*Maldonado v. Superior Court* (2002) 94 Cal.App.4th 1390, 1397 [115 Cal.Rptr.2d 137].)

Plaintiffs contend that the trial court wrongly limited them to "a single, narrowly defined special interrogatory of whether there was a 'failure to comply with the regulatory scheme.' " This allegedly "prevented Plaintiffs from discovering information to support their contentions and evaluate the case, i.e., whether Defendants delivered drinking water to residents of the San Gabriel Valley beginning in the 1940s that failed to comply with regulatory drinking water standards in effect at the time of the violation." We reject plaintiffs' discovery argument for several reasons.

First, as the PUC-Regulated Defendants correctly point out, the trial court's phase III discovery was the product of a *joint* proposal made by plaintiffs and the water purveyor defendants. The opening sentence of the parties "*Hartwell III* Proposal" stated that "Plaintiffs and the Water Purveyor Defendants have met and, after substantial negotiations, *have agreed on a proposal* for phase III of the *Hartwell* process." (Italics added.) Attached to the proposal were form requests for admission and the "single, narrowly defined special interrogatory" of which plaintiffs now complain. Both plaintiffs and the water purveyor defendants explicitly requested that the trial court approve the form

of discovery that they had submitted. Plaintiffs can hardly object that this form of discovery was too restrictive when they themselves had a hand in drafting it and specifically requested that the trial court approve it. If plaintiffs thought that the scope of discovery permitted during phase III was unreasonably narrow, they should have made an appropriate objection to the trial court. (See *Steele v. Totah* (1986) 180 Cal.App.3d 545, 551–553 [225 Cal.Rptr. 635] [party waived objection to form of request for admission by failing to present matter to the trial court].)

Second, it is apparent from plaintiffs' briefs that their discovery argument is largely a restatement of their challenges to the trial court's definition of the term "standards" for purposes of *Hartwell*. In support of their discovery argument, plaintiffs contend that they "objected all along to the overly narrow, and ultimately dispositive, *definition of 'standards'* adopted in the trial court's discovery orders in this case." (Italics added.) Plaintiffs have expressly linked their objection to the scope of discovery to their challenge to the trial court's definition of "standards." Having rejected their challenge to the definition itself, we must likewise reject plaintiffs' challenge to the trial court's approval of discovery limited to matters relevant to that definition.

Third, the record seems to contradict plaintiffs' assertion that their discovery was inhibited. The trial court's initial case management order required each PUC-Regulated Defendant to "make available all test data in its possession with regard to the water that has been served by the PUC Regulated Utility up to and including September 1, 1998." It appears that the PUC-Regulated Defendants produced considerable discovery in response to the case management order. For example, the record reflects that on January 31, 2003, California-American Water Company produced five compact discs containing 52,232 pages of testing data. In addition, the water purveyor defendants responded to court-approved interrogatories and requests for production regarding the release of chemical substances into the soil and groundwater in the San Gabriel Valley from January 1, 1955, to September 1, 1998, and regarding sampling of their distribution systems over the same period. On August 21, 2003, the trial court ordered the water purveyor defendants to produce additional discovery to plaintiffs, and it appears that this discovery was produced.

In summary, we find no error in the trial court's approval of the parties' joint "*Hartwell III* Proposal." Plaintiffs have failed to demonstrate that the trial court abused its discretion in adopting discovery requests that they themselves presented to the court.

## DISPOSITION

The judgment is affirmed.

Simons, J., and Gemello, J., concurred.