Filed 9/12/14  P. v. Castillo CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059092 |
| v. | (Super.Ct.No. FCH1200266) |
| PEDRO RENTERIA CASTILLO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Mary E. Fuller, Judge.  Affirmed.

Robert L.S. Angres, under appointment by the Court of Appeal, and Pedro Renteria Castillo, in pro. per., for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

A jury convicted defendant and appellant Pedro Renteria Castillo of driving under the influence of alcohol causing injury (count 1; Veh. Code, § 23153, subd. (a))[1] and

---

[1]  All further statutory references are to the Vehicle Code unless otherwise indicated.

driving with a blood alcohol concentration (BAC) of 0.08 percent or higher causing injury (count 2; § 23153, subd. (b)).  The jury additionally found true allegations defendant personally inflicted great bodily injury on victim Senna Smith[2] and had a BAC of 0.15 percent or higher during his commission of both offenses (§ 23578).[3]  The court sentenced defendant to an aggregate term of imprisonment of five years.

After defendant's trial, counsel filed the notice of appeal; this court appointed counsel to represent defendant.  Counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738, setting forth a statement of the case, a statement of the facts, and identifying four potentially arguable issues:  (1) whether defendant was prejudiced because counsel and the court erroneously believed defendant was presumptively ineligible for probation; (2) whether the court prejudicially erred in neglecting to read one line in CALCRIM No. 105 during pretrial instruction; (3) whether the court prejudicially erred in permitting Deputy Manu Hubbard to testify as to how someone can break the basic traffic speed law; and (4) whether the court prejudicially erred in inserting one word in CALCRIM No. 2100, which changed its meaning.

Defendant was offered the opportunity to file a personal supplemental brief, which he has done.  In his brief, defendant raises 10 issues:  (1) whether the results of the

---

[2]  For ease of reference, the Smiths shall be referred to by their first names.  No disrespect is intended.

[3]  The jury found not true allegations on both counts defendant had personally inflicted great bodily injury as to Senna's father, Scott.

preliminary alcohol screening device (PAS) should have been excluded from evidence at the preliminary hearing; (2) whether the court should have set aside the information with respect to the great bodily injury allegations as to Scott respecting both counts 1 and 2; (3) whether the prosecution failed to properly preserve the blood withdrawn from defendant; (4) whether the prosecution failed to turn over purported information to the defense that the blood withdrawn from defendant was left in Hubbard's trunk for 24 hours; (5) whether the court should have excluded evidence of the results of a CAT scan; (6) whether the court erroneously qualified Dr. Darren Stewart to testify as an expert; (7) whether the court failed properly to respond to the jury's question; (8) unspecified acts of ineffective assistance of counsel (IAC)[4]; (9) unspecified errors in marking out portions of the written jury instructions given the jury; and (10) insufficiency of the evidence to support the great bodily injury enhancements with respect to Scott and his son Brandon. Defendant requests this court reverse the judgment and remand the matter for an evidentiary hearing on and resentencing to unspecified, lesser included crime(s), including the striking of the great bodily injury enhancements. We affirm the judgment.

### FACTUAL BACKGROUND

On July 10, 2012, around 1:00 p.m., Erin Nunez was driving in the City of Chino Hills with her father when she noted a Chevy Silverado driving fast, crossing over the lines of lane delineation, driving through stop signs, weaving, crossing into oncoming traffic, and hitting the center median island repeatedly. "I noticed the weaving and

---

[4] We shall assume the alleged acts of IAC relate to defendant's contentions where the issue was forfeited for failure of defense counsel or defendant to object.

3

thought there was a possibility that there was a drunk driver.  So I was paying attention to the vehicle at that point."  Nunez was traveling at around 55 to 60 miles per hour; defendant was going much faster.

Nunez called 911, informing the operator of the make and model of the car "[b]ecause [she] thought there was a drunk driver and knew that about that time there would be kids getting out of school and there was an elementary school right there" nearby.  The Silverado, without braking, ran into the rear of a small white vehicle stopped at a red light.  Nunez identified defendant as the driver of the Silverado.

Scott was stopped at the red light with his children, Senna (age seven) and Brandon (age 10), in the back seat.  He was struck from behind by a Silverado truck.  Scott testified he was immediately in severe pain, believed he lost consciousness, and became "foggy" minded.  Scott and his children were transported by separate ambulances to the Kaiser Hospital in Fontana.

Scott was treated with intravenous pain medication for a sprained neck and spine.  He was released from the hospital, but readmitted several hours later.  Scott received approximately 30 treatments from Stewart, a chiropractor, during the ensuing months.

Senna had blood trickling down her face, her eyes were rolled up in her head, and she was spitting up blood.  Senna spent three to four days in the hospital.  She sustained a fracture involving her frontal sinus, injuring the nerve endings in her eye from which she could have lost her sight.  Senna incurred a subdural hematoma.  The injuries could potentially leave her with long-term or permanent chronic brain infections and headaches.

4

Hubbard testified he was dispatched to the scene of the accident at 1:10 p.m. that day; he arrived at 1:15 p.m.  Hubbard identified defendant at the scene; defendant was sitting on a curb.  Hubbard spoke with defendant, who informed Hubbard he was driving the Silverado when the car in front of him stopped; defendant collided with its back end.

Hubbard observed defendant "had bloodshot, red and watery eyes and smelled the odor of an alcoholic beverage coming from his person."  Defendant's speech was slurred.  Defendant could not get up by himself; once he began walking he required help and was staggering from left to right and almost fell a couple of times.

Hubbard placed defendant under arrest for suspicion of driving under the influence of alcohol.  Defendant was transported to the hospital.  At the hospital, Hubbard watched as Teresa Marrs, a certified phlebotomist, withdrew blood from defendant's arm at 2:26 p.m.  Angela Miller, a forensic analyst, analyzed defendant's blood sample, which tested for a BAC of 0.35 percent, more than four times the legal limit.  A man of defendant's height and weight would have to imbibe 13 standard alcoholic drinks to reach that BAC.

DISCUSSION

A.      Presumptive Ineligibility for Probation.

The probation report was filed on March 19, 2013, prior to trial.[5]  The probation report reflected, "Statutory provisions limiting or prohibiting a grant of probation in this

---

[5]  On February 22, 2013, defendant pled guilty to the count 2 offense and the allegation of great bodily injury to Senna.  In return, he was promised a three-year term of imprisonment.  On April 19, 2013, defendant himself orally moved to withdraw the plea based primarily on what appears to be buyer's remorse and, in some part, an asserted misunderstanding as to what credits he would have been awarded.  The People stipulated to withdrawal of defendant's plea.

5

matter do exist. Specifically, [Penal Code section] 1203[, subdivision] (e)(3), except in unusual cases where the interest of justice would best be served if the person is granted probation, probation shall not be granted to any of the following persons: any person who *willfully* inflicts Great Bodily Injury or torture in the perpetration of a crime of which he or she has been convicted. [¶] A review of the facts showing an unusual case indicate none apply." (Italics added.) Defendant contends the probation officer in his report and, therefore, the court and parties, erroneously believed defendant was presumptively ineligible for probation. Thus, defendant was prejudiced because the court was unaware it did not have to find unusual circumstances to grant defendant probation when it sentenced him to prison. We disagree.

"Given [the] structure of [Penal Code] section [1203, subdivision (e)(3)], we conclude the only reasonable reading of it is the word 'willful' requires the defendant's intent to cause great bodily injury or torture, not merely that the crime resulted in great bodily injury or torture. [Citation.]" (*People v. Lewis* (2004) 120 Cal.App.4th 837, 853.) "A trial court has broad discretion to determine whether a defendant is suitable for probation. [Citation.] . . . An appellant bears a heavy burden when attempting to show an abuse of such discretion. [Citation.] To establish abuse, the defendant must show that, under all the circumstances, the denial of probation was arbitrary, capricious or exceeded the bounds of reason. [Citation.]" (*People v. Bradley* (2012) 208 Cal.App.4th 64, 89.) "'California courts have long held that a single factor in aggravation is sufficient to justify a sentencing choice, . . .' [Citation.]" (*People v. Quintanilla* (2009) 170 Cal.App.4th 406, 413.)

Here, admittedly, there is no evidence defendant intended to cause great bodily injury. Nevertheless, although the probation officer, and possibly the parties and the court were under the erroneous belief defendant was presumptively ineligible for probation, any error was harmless. The People filed a sentencing brief addressing defendant's eligibility for probation and arguing the seriousness of the crime negated any consideration of probation. Defense counsel filed a statement in mitigation in which counsel argued, "[d]efendant would be a good candidate for probation given that he has not previously been convicted of any criminal activity." The court indicated it had read the probation officer's report, the People's sentencing brief, and defendant's statement in mitigation.

The court noted, "This was an extremely serious violation, a very dangerous violation of the law. You're lucky you're not here on a murder charge, [defendant]. It was your choice to drink to the incredible excess of .35 percent. The BA[C] taken was sometime significantly after the accident itself. There's just absolutely no excuse whatsoever." The court stated "I am going to deny probation in this matter." There is simply no reasonable probability the trial court would have granted defendant probation in this case regardless of what the probation officer's report read.

B.      CALCRIM No. 105.

In reading CALCRIM No. 105 to the jury during pretrial instruction, the court left out the line reading "What was the witness's attitude about the case or about testifying?" However, nothing in the statute on preinstruction requires the court read CALCRIM No. 105 at all, let alone in its entirety. (§ 1122; See *People v. Smith* (2008) 168 Cal.App.4th

7

7, 15-16.) Moreover, the court instructed the jury with the identical line in CALCRIM No. 226 after trial. Any error in failing to preinstruct the jury with one line of CALCRIM No. 105 was harmless. (*Smith*, at p. 13 [correctness of jury instructions determined by entire charge of court, not from parts on one particular instruction]; *People v. Carter* (2010) 182 Cal.App.4th 522, 533 [failure to pre-instruct jury with CALCRIM No. 101 in its entirety harmless under any standard where substantive content contained in other instructions and no record that failure to instruct jury affected defendant's right to a fair trial].)

C.    Hubbard's Testimony Regarding How One can Violate the Speed Law.

Hubbard testified he had seven years of experience enforcing the vehicle code. He testified a violation of section 22350, the basic traffic speed law, could be violated, "Say for example in this case if the vehicle was stopped and if you were to hit . . . you were driving too fast for the distance because . . . that vehicle is in front of you, which means that you were unsafe." Defense counsel objected on the basis that the question and answer called for a legal conclusion. The court overruled the objection. Hubbard continued, "It could be either also for when the . . . demographics of the road, the width of the road, different—other types of cars, speed limit of the road, so forth and so on."

Although Hubbard's testimony was apparently intended to encompass a legal conclusion, i.e., that defendant violated the speed law, Hubbard's testimony on the matter was largely unintelligible and hardly helpful in establishing that defendant was speeding. Moreover, Nunez's testimony that she was traveling between 55 and 60 miles per hour on city streets and that defendant was driving much faster than she, was obviously credited

8

by the jury on the issue of whether defendant was speeding.  Thus, any error was harmless.

D.      Error in Reading CALCRIM No. 2100.

In reading CALCRIM No. 2100 to the jury the court read, "If the People have *not* proved beyond a reasonable doubt that the defendant's blood alcohol was .08 percent or more at the time of the chemical analysis, you may, but are not required to conclude that [t]he defendant [w]as under the influence of an alcoholic beverage at  the time of the alleged offenses."  (Italics added.)  By inserting the word "not" in the instruction, defendant contends the court prejudicially erred because it changed the entire meaning of the instruction.  We disagree.

First, neither counsel below objected to the instructions as read.  (*People v. DeFrance* (2008) 167 Cal.App.4th 486, 495.)  Second, there were two obvious inaccuracies in the transcription of that particular paragraph of the instruction alone.  Thus, we cannot be certain the insertion of the word "not" was not simply a transcription error.  Third, even assuming the transcription is completely accurate we still conclude there is no possibility the jury could have interpreted the instruction literally as it was properly instructed on the requisite elements of the offense, which included that defendant drove while under the influence of an alcoholic beverage which, on count 1, does not even require that the jury find defendant had a BAC of 0.08 percent or higher.  (*People v. Rundle* (2008) 43 Cal.4th 76, 149-150, disapproved of on another point by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

9

Regardless, any error was harmless under any standard.  The People accurately argued to the jury, "the law in the state of California is such that if your blood is tested and in fact .08 percent or more you may as jurors, although you're not required to, but you can conclude based on that alone he was under the influence of alcohol."  The jury received an accurate written instruction on CALCRIM No. 2100.  "'We of course presume "that jurors understand and follow the court's instructions."  [Citation.]  This presumption includes the written instructions.  [Citation.]  To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control.'  [Citation.]"  (*People v. Edwards* (2013) 57 Cal.4th 658, 746.)

E.      Admission of the PAS Results.

During the preliminary hearing, Hubbard testified he had approximately 12 to 24 hours training on the PAS.  He had used it more than 200 times.  Hubbard used it on defendant "that day in a manner that was consistent with the training that [he] had received."  The device functioned properly, although it had not been calibrated that day.  The results of the PAS reflected defendant had a BAC of 0.336 percent.

Defendant contends the results of the PAS should have been excluded from evidence during the preliminary hearing.  We disagree.  First, defendant failed to object to admission of the evidence.  (*People v. Brown* (2014) 59 Cal.4th 86, 99-100, 102 (*Brown*) [failure to object to testimony based on purportedly unreliable evidence forfeits contention on appeal].)  Second, defendant failed to raise the issue in his Penal Code section 995 motion.  (See *People v. Hawkins* (2012) 211 Cal.App.4th 194, 202-203

10

[failure to raise issue in Penal Code section 995 motion below forfeits contention on appeal]; Pen. Code, § 1510; *Ghent v. Superior Court* (1979) 90 Cal.App.3d 944, 950-951.) Third, no evidence established a PAS had to be calibrated daily in order to work properly. Indeed, Hubbard's testimony established otherwise. Fourth, even if error, it was harmless as evidence of defendant's BAC of 0.35 percent from the blood drawn at the hospital was also admitted during the preliminary hearing.

F.     Denial of Penal Code Section 995 Motion.

The court held defendant to answer for the great bodily injury allegations with respect to Scott. Defendant filed a Penal Code section 995 motion contending the evidence adduced at the preliminary hearing was insufficient to hold him to answer for the great bodily injury allegations. The court denied the motion. Defendant contends the court should have set aside the information with respect to the great bodily injury allegations with respect to Scott as requested in his Penal Code section 995 motion. We disagree.

First, Scott testified he endured a "great, great amount of pain" immediately after the collision. He was transported and admitted to the emergency room of the Kaiser Hospital in Fontana. He received a "significant contusion" to his forehead, a "rupture of the vein in" his arm "which led to a great deal of swelling," and "suffered trauma to [his] chest, as well as [to his] entire spine." Hospital personnel placed a neck brace on him, established a intravenous line, drew blood, and administered opiate medication for his pain. He continued to suffer pain for four months during which he received treatment for his back, neck, and chest. He suffered "quite a bit of reduced range of motion." The

11

evidence was such that there was probable cause to hold defendant to answer for the great bodily injury allegations with respect to Scott. Second, and most importantly, the jury found not true the allegations as they related to Scott. Thus, it is largely irrelevant that he was held to answer on the allegations.

G.     Admission of CAT Scan Results.

Prior to trial, defense counsel requested copies of any CTs. The People indicated they did not have any X-rays or CTs in their possession nor did they have any obligation to obtain them for the defense. The prosecutor argued defendant could obtain copies by subpoena duces tecum. Defense counsel responded, "I'm not going to subpoena documents that can potentially implicate my client." The court noted, "you do have subpoena power. So when you say you wouldn't subpoena something that might in some way be evidence in favor of the Prosecution, that's your choice. I mean that tells me you really don't want that evidence then, you're just making this motion as a way to disrupt the Prosecution's case. But I've seen no authority that says they have to provide . . . that evidence because they have to provide you police reports." The court concluded, "If you want something from Kaiser hospital, you need to subpoena it. So I'm going to deny your request . . . ." Defense counsel apparently never subpoenaed the CT.

At trial, the pediatric doctor who treated Senna testified, "If you look at the record of the CT she had air in her brain and she is—because those sinuses are connected to the air. So if I rupture the skin on that sinus and bone, then that means the brain and the outside air is all contacted. So anything that is out here, bacteria, viruses can go inside her brain. That [is] why she was watched for meningitis, you know, infection of the

12

meninges, that dura mater." Defendant contends the results of the CT should have been excluded from evidence.

First, defendant forfeited any contention regarding admission of the results of the CT by failing to subpoena the CT or object below during the doctor's testimony regarding it. (*Brown*, *supra*, 59 Cal.4th at pp. 99-100, 102.) Second, defendant offers no legal basis, nor can we find any, for excluding the doctor's observations regarding the CT. (*In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 690, fn. 18 [failure to develop an argument or cite any authority in support of a contention results in the forfeiture of the issue on appeal].)

H.     Qualification of Dr. Darren Stewart as an Expert Witness.

Defendant filed a pretrial motion to exclude any testimony by Stewart, asserting he was not qualified to testify as an expert because he is a chiropractor. The court ruled, "Dr. Stewart is permitted to testify to—depends on the testimony he gives." "I'm certainly not going to prevent [the People] from calling [Stewart] as a witness within [the chiropractic] field. If he[] starts to give opinions on issues that are not within his field, I would expect you to object and I would sustain them."

Stewart testified at trial, without any objection from defense counsel, that he had been a chiropractor for 15 years. He had a bachelor's degree in science and graduated from Cleveland Chiropractic College, a four-year graduate program. Stewart had treated thousands of patients and was licensed by the State of California and the Chiropractic Board of Examiners to practice chiropractics. Stewart treated Scott during 32 visits from

July 24, through November 6, 2012. Scott had "positive orthopedic tests and also loss of range of motion, palpable tenderness."

First, defendant failed to object during Stewart's testimony and has therefore forfeited any contention Stewart was not qualified to testify as an expert. (*People v. Panah* (2005) 35 Cal.4th 395, 478 ["Defendant's failure to have challenged [Stewart's] expert qualifications in the trial court forfeits his claim. [Citation.]"].) Second, the qualification of expert witnesses is within the discretion of the trial court and will not be disturbed absent a showing of manifest abuse. (*Brown*, *supra*, 59 Cal.4th at pp. 99-100.) We find no such abuse. Third, chiropractors have been found to have properly qualified as expert witnesses at least since 1931. (*Johnston v. Peairs* (1931) 117 Cal.App. 208, 216-217.) Finally, and most importantly, the jury found not true the allegations defendant had caused great bodily injury to Scott. Thus, it is largely irrelevant that Stewart testified because his testimony was adduced solely for the purpose of proving great bodily injury to Scott.

I.  Prosecution's Failure to Preserve the Blood Evidence.

Marrs testified she drew blood from defendant at 2:26 p.m. on July 10, 2012, into a tube which contained potassium sulfate, "an anticoagulant so when I take blood out of the body, it stays exactly how it is when I took it; no clots and no platelet damage." Hubbard testified Marrs placed the vial in an envelope, which he placed in the unrefrigerated trunk of his car at 4:00 p.m. when defendant was released from the hospital and Hubbard transported defendant to jail. It was a hot summer day in the triple digits. Hubbard then logged the vial into the evidence locker. Approximately two hours

had passed since he received the envelope from Marrs and when he logged it into the evidence locker.

Miller testified the vial of blood must be shaken before being placed in the envelope, otherwise the blood at the top of the vial might clot. There are two substances inside a vial used for taking blood samples: potassium oxylate to stop the blood from coagulating and sodium fluoride as a preservative. Without the anticoagulant and preservative, a blood sample will turn into a gel within minutes and become hard-clotted within an hour. Without the preservative an unmistakable odor would permeate the lab upon opening the vial. "The blood is stored in a locked refrigerator." "I shake them real well before I analyze them."

Miller testified that keeping a blood sample in the trunk of a car on a hot day for two hours before being transported to evidence locker would not affect the accuracy of the blood analysis because the anticoagulant and preservative helps keep the blood from breaking down. She testified she noted nothing unusual about the sample. The blood was not clotted at the top of the vial and she did not notice any smell upon opening the vial. Miller opined that even if the vial had not been property shaken before being placed in the envelope, it would not have affected the results of her test.

Defendant contends the prosecution failed to preserve the integrity of his blood sample and that it should have been excluded from evidence because Marrs did not testify she shook the vial before placing it in the envelope, Marrs did not testify there was a

15

preservative in the vial, and it was placed in Hubbard's unrefrigerated vehicle's trunk overnight.[6]

First, defendant failed to object at trial to admission of the BAC results; thus, he has forfeited any contention regarding its admission at trial. (*Brown*, *supra*, 59 Cal.4th at pp. 99-100, 102.) Second, just because Marrs did not testify she shook the vial, does not mean she did not do so. Defendant could easily have asked this question of Marrs during cross-examination; however, he did not. Moreover, Miller testified that if the vial had not been shaken, it would have clotted at the top. That did not occur. Thus, there was circumstantial evidence Marrs shook the vial before placing it in the envelope.

Third, Miller testified that if the vial did not have a preservative, an unmistakable odor would have permeated the lab upon her opening of it. That did not happen in this case. Thus, there was circumstantial evidence the vial contained a preservative. Fourth and finally, Hubbard testified he received the vial of defendant's blood in the envelope in which Marrs had placed it immediately after she withdrew the blood from defendant at 2:26 p.m. Hubbard did not place the envelope in his trunk until 4:00 p.m. when he also placed defendant in the backseat to take defendant to jail. Hubbard testified he logged the vial into evidence within two hours of his receipt of the envelope containing it. Thus, the vial was in Hubbard's trunk for only half an hour, not two hours as defendant suggests. Moreover, even if it had been in Hubbard's trunk for two hours in hot weather,

---

[6] There was no evidence in the record the vial of defendant's blood was placed in Hubbard's vehicle's trunk overnight. Rather, Hubbard testified he placed the vial in a sealed envelope in the evidence locker within two hours of receiving it from Marrs.

Miller testified this would not have affected the accuracy of her BAC determination. Therefore, the result of the BAC analysis of the vial of defendant's blood was properly admitted at trial.

J.      Marked-Out Jury Instructions.

Defendant makes an unspecified complaint regarding the fact that portions of many of the written jury instructions given to the jury are marked out. First, defendant forfeited any contention the instructions given the jury were in error by failing to object below. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 475 [failure to object to request clarification of jury instructions forfeits claim of error on appeal].) Although it is unclear from the record whether defendant was present during the discussion of modifications to the standard jury instructions, the record does reflect the marked out portions of the jury instructions are those to which the parties agreed during their discussions on the relevant portions of the instructions with which to instruct the jury. Regardless, defendant fails to argue how he was prejudiced by the modifications. (*In re Groundwater Cases*, *supra*, 154 Cal.App.4th at p. 690, fn. 18 [failure to develop an argument or cite any authority in support of a contention results in the forfeiture of the issue on appeal].)

K.      Response to Jury Instruction.

During its deliberations, the jury sent the following questions, in one request, to the court: "Definitions: What is the meaning of 'great bodily injury.' What is the meaning of 'moderate bodily injury.' What is the meaning of 'minor bodily injury.' What is the meaning of 'during the commission of the offense[?]' Em[phasi]s [on] commission[.]"

17

The court responded as follows: "Great bodily injury is defined in instruction #27 (top #). There is no further definition. You must decide if the injuries in this case are significant or substantial physical injuries based on all the evidence. There is no legal definition to the words minor or moderate and you must apply the every day [*sic*] ordinary meaning to those terms. [¶] Also, as used in Instruction #27, 'during the commission of that crime' is the same as 'in the commission of that crime.'" Defendant contends the court's response was prejudicially inaccurate.

Defendant forfeited any contention the response was inaccurate by failing to object below. (*People v. Debose* (2014) 59 Cal.4th 177, 207; *People v. Dykes* (2009) 46 Cal.4th 731, 789-799.) In any event, the court's response to the jury's questions was consistent with the law. (*Dykes*, at p. 798 [response consistent with law not error].) In fact, the court simply referred the jury back to the instruction, agreed upon by defendant, which defined great bodily injury and told them there were no instructions for other terms for which the jury sought definitions. The court committed no error in its response to the jury's questions.

L.    Sufficiency of the Evidence on the Great Bodily Injury Enhancements.

Defendant contends insufficient evidence supports the jury's true findings on the great bodily injury enhancements with respect to victims Scott and Brandon. First, the great bodily injury enhancements with respect to Brandon were dismissed after the preliminary hearing, when the court determined there was insufficient evidence to hold

18

defendant to answer for the allegation.[7]  Second, the jury found not true the allegations that defendant caused great bodily injury to Scott.  Thus, the court and jury essentially agreed with defendant's contention that insufficient evidence supported the enhancements.  Defendant has suffered no adverse consequences because those allegations were dismissed or found untrue.  Therefore, defendant has no basis for complaint on the issue.  Under *People v. Kelly* (2006) 40 Cal.4th 106, we have conducted an independent review of the record and find no arguable issues.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:


McKINSTER
          Acting P. J.


MILLER
          J.

---

[7]  The minute order for November 28, 2012, the date of the preliminary hearing, erroneously reflects defendant was held to answer on all counts and allegations.