Filed 1/28/19

OPINION ON REHEARING

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D073304 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS295489) |
| VERONICA AGUAYO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Dwayne K. Moring, Judge. Conditionally reversed, with directions.

Linnéa M. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Warren Williams and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part II of the Discussion.

Veronica Aguayo hit her elderly father about 50 times with a bicycle lock and chain, then threw a ceramic pot on his head. A jury found her guilty of assault with a deadly weapon other than a firearm (Pen. Code, § 245, subd. (a)(1)) and assault by means of force likely to produce great bodily injury (force-likely assault) (Pen. Code, § 245, subdivision (a)(4)).[1] The trial court placed her on probation. Aguayo appealed.

This is our second opinion in this appeal. In our original opinion, we rejected the sole issue Aguayo initially asserted: that we must vacate her conviction for force-likely assault because it is a lesser included offense of assault with a deadly weapon. Aguayo then filed a petition for rehearing in which she challenged the reasoning of our original opinion and asserted a new argument based on legislation enacted while this appeal was pending. Specifically, she argued that newly enacted sections 1001.35 and 1001.36, which grant trial courts the discretion to place defendants with mental disorders into pretrial diversion, apply retroactively to her case. We granted Aguayo's petition on the newly asserted issue and received supplemental briefing from the parties.

In this opinion, we once again reject the lesser-included-offense argument Aguayo originally raised. The portions of this opinion addressing that issue are substantively identical to our original opinion. As to the new issue, which is now pending before the California Supreme Court on its own motion (see *People v. Frahs* (2018) 27 Cal.App.5th 784, 791 (*Frahs*) [finding the statutes retroactive], review granted Dec. 27, 2018,

---

[1]     Statutory references are to the Penal Code unless otherwise noted. For convenience, we will use the phrase "deadly weapon" to refer to a deadly weapon *other than a firearm*, unless otherwise noted.

S252220), we conclude the mental health diversion legislation applies retroactively. We further conclude Aguayo has made a showing of potential eligibility sufficient to warrant a remand for further proceedings. Accordingly, we conditionally reverse the judgment for the limited purposes specified in the Disposition.

## FACTUAL AND PROCEDURAL BACKGROUND

On the afternoon of August 8, 2017, 43-year-old Veronica Aguayo was working on her bicycle in her parents' yard. Her 72-year-old father (Father) turned on the sprinklers to water the plants, accidentally wetting Aguayo's cell phone charger. Aguayo began yelling expletives and insults at Father, who turned around to go back inside because he "didn't want to hear her mouth calling [him] names."

As Father turned, Aguayo hit him on the back with her bicycle lock and chain. Father grabbed the lock to prevent Aguayo from hitting him again, but as they struggled over the lock, Father slipped and let go of the chain. Aguayo then hit Father with the chain and lock about 15 times on the arms, chest, and head. Father again grabbed the lock, and during a struggle for possession, Aguayo fell to the ground, pulling Father with her.

On the ground, Aguayo began "hollering" for her mother (Mother) inside. Aguayo then grabbed a small ceramic pot and threw it at Father, striking his head exactly where he had previously had two brain surgeries. Father fell on top of Aguayo, grabbed a rock to hit her with, but thought better of it and threw the rock away. However, the rock ricocheted off the house and hit Aguayo.

3

Father got up to go back in the house, and another struggle ensued for possession of the chain and lock, which Father apparently won. As Aguayo picked up a rock to hit Father, Mother emerged from the front door and warned, "Don't do that." Aguayo discarded the rock, and Father tossed the chain and lock toward her. Aguayo picked up the chain and lock, and rode off on her bicycle. The whole encounter lasted between five minutes (according to Mother) and 30 minutes (according to Father), during which Father estimated he was hit about 50 times.

Mother called 911, and police and paramedics responded. Father was evaluated at the hospital and released with only minor treatment. Police apprehended Aguayo a few hours later during an unrelated traffic stop.

Aguayo was charged with three offenses: (1) elder abuse, with deadly-weapon and great-bodily-injury enhancement allegations (§§ 368, subd. (b)(1), 1192.7, subd. (c)(23), 12022, subd. (b)(1)); count 1); (2) assault with a deadly weapon, with an enhancement allegation that she "personally used a dangerous and deadly weapon, to wit: bicycle chain/lock" (§§ 245, subd. (a)(1), 1192.7, subd. (c)(23); count 2); and (3) force-likely assault (§ 245, subd. (a)(4); count 3). After deliberating less than two hours, the jury found Aguayo guilty on both assault counts, and found true the deadly-weapon-use allegation attached to count 2. The jury was unable to reach a verdict on the elder abuse count, which the court ultimately dismissed at the prosecutor's request.

Although Aguayo was presumptively ineligible for probation, the court found she had untreated mental health issues that constituted unusual circumstances warranting probation. Accordingly, the court suspended imposition of sentence and placed Aguayo

4

on three years' formal probation with a variety of terms and conditions, including that she spend 365 days in local custody. Despite having suspended imposition of sentence, the court sentenced Aguayo concurrently on counts 2 and 3, but stayed the sentence on count 3 under section 654.

Aguayo appeals.

## DISCUSSION

### I. *Aguayo's Lesser-included-offense Challenge*

Aguayo contends we must vacate her conviction for force-likely assault because it is a lesser included offense of assault with a deadly weapon. We disagree.

"In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct." (*People v. Reed* (2006) 38 Cal.4th 1224, 1226 (*Reed*); see §§ 954,[2] 654;[3] *People v. Sanders* (2012) 55 Cal.4th 731, 736 (*Sanders*); *People v. Cady* (2016) 7 Cal.App.5th 134, 139 (*Cady*).) "However, a

---

[2] Section 954, which addresses multiple convictions, states in part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . . The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged, and each offense of which the defendant is convicted must be stated in the verdict or the finding of the court . . . ."

[3] Section 654, subdivision (a), which prohibits multiple punishments, states: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

'judicially created exception to this rule prohibits multiple convictions based on necessarily included offenses.' " (*Sanders*, at p. 736; see *Reed, supra*, 38 Cal.4th at p. 1227; *Cady*, at p. 139.) "When a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed." (*Sanders*, at p. 736; *Cady*, at p. 139.) "If neither offense is necessarily included in the other, the defendant may be convicted of both, 'even though under section 654 he or she could not be punished for more than one offense arising from the single act or indivisible course of conduct.' " (*Sanders*, at p. 736.)

The courts "have established two tests for whether a crime is a lesser included offense of a greater offense: the elements test and the accusatory pleading test." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 197.) The parties agree that "[i]n deciding whether multiple convictions are barred because one offense is a lesser included offense of the other, we apply the 'elements' test." (*Cady*, *supra*, 7 Cal.App.5th at p. 140; see *Reed*, *supra*, 38 Cal.4th at p. 1229.) "Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former." (*Reed*, at p. 1227; see *Sanders*, *supra*, 55 Cal.4th at p. 737.) "In other words, ' "[i]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former." ' " (*Sanders*, at p. 737; see *Reed*, at p. 1227.) We apply the elements test "in the abstract,"

6

without regard to the "evidence introduced at trial." (*People v. Chaney* (2005) 131 Cal.App.4th 253, 256 (*Chaney*).)

Simple assault "is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) Section 245 enumerates several forms of aggravated assault. We are concerned here with two of the forms specified in subdivision (a):

> "(1) Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm shall be punished . . . . [¶] . . . [¶]
>
> "(4) Any person who commits an assault upon the person of another by any means of force likely to produce great bodily injury shall be punished . . . ."

Using CALCRIM No. 875, the trial court instructed the jury regarding the elements of assault with a deadly weapon and force-likely assault. As instructed, the elements of assault with a deadly weapon are:

> "1. The defendant did an act with a deadly weapon other than a firearm that by its nature would directly and probably result in the application of force to a person;
>
> "2. The defendant did that act willfully;
>
> "3. When the defendant acted, she was aware of facts that would lead a reasonable person to realize that her act by its nature would directly and probably result in the application of force to someone;
>
> "4. When the defendant acted, she had the present ability to apply force with a deadly weapon other than a firearm[;] [¶] AND

7

"5. The defendant did not act in self-defense."[4]

The elements of force-likely assault are:

"1. The defendant did an act that by its nature would directly and probably result in the application of force to a person, and

"2. The force used was likely to produce great bodily injury;

"3. The defendant did that act willfully;

"4. When the defendant acted, she was aware of facts that would lead a reasonable person to realize that her act by its nature would directly and probably result in the application of force to someone;

"5. When the defendant acted, she had the present ability to apply force likely to produce great bodily injury to a person. [¶] AND

"6. The defendant did not act in self-defense."

As to both offenses, the jury was instructed with CALCRIM No. 875 regarding the meaning of "force":

"The terms *application of force* and *apply force* mean to touch in a harmful or offensive manner. The slightest touching can be enough if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind. [¶] . . . [¶] The People are not required to prove that the defendant actually touched someone. [¶] The People are not required to prove that the defendant actually intended to use force against someone when she acted. [¶] No one needs to actually have been injured by defendant's act. But if someone was injured, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed an assault, and if so, what kind of assault it was."

---

[4] The court included this optional self-defense element because Aguayo testified she struck her father with the chain and lock only because he lunged at her while she was swinging the chain defensively.

8

The elements of both offenses are, thus, substantially similar *except for* the first element of assault with a deadly weapon (doing an act with a deadly weapon), and the first and second elements of force-likely assault (doing an act that would probably result in the application of force to a person where the force is "likely to produce great bodily injury"). Force-likely assault, then, is only a lesser included offense of assault with a deadly weapon if every assault with a deadly weapon requires that the defendant use the weapon in a way that is likely to produce great bodily injury. Although that will *often* be the case, it is not *necessarily* so.

In *People v. Aguilar* (1997) 16 Cal.4th 1023 (*Aguilar*), the California Supreme Court addressed whether hands and feet can constitute deadly weapons under section 245. (*Aguilar*, at p. 1026.) In doing so, the court explored the meaning of "deadly weapon" as used in section 245:

> "[A] 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citations.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury. In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue." (*Aguilar*, at pp. 1028-1029.)

In light of this definition, the court explained that, "Ultimately, (*except in those cases involving an inherently dangerous weapon*), the jury's decisionmaking process in

9

an aggravated assault case under section 245, subdivision (a)(1),[5] is functionally identical regardless of whether, in the particular case, the defendant employed a weapon alleged to be deadly *as used* or employed force likely to produce great bodily injury; in either instance, the decision turns on the nature of the force used." (*Aguilar*, *supra*, 16 Cal.4th at p. 1035, italics added.) Thus, although the court concluded "a 'deadly weapon' within the meaning of section 245 must be an object extrinsic to the human body" (*id.* at p. 1034), the court found the prosecutor's contrary closing argument was harmless because the jury necessarily engaged in the same analysis under either theory because the alleged weapons (hands and feet) were not inherently deadly and, thus, their deadly nature turned on the manner of their use. (*Id.* at p. 1036 ["Regardless . . . of which path the jury took, the same finding was necessary to a verdict of guilt."].)

But the *Aguilar* court explained that its reasoning equating assault with a deadly weapon and force-likely assault does not apply in the context of an *inherently deadly weapon*:

> "We observe that, despite the identity of the jury's reasoning processes under either the 'deadly weapon' clause or the 'force likely' clause in this case, our holding does not reduce the former clause to surplusage. *There remain assaults involving weapons that are deadly per se, such as dirks and blackjacks, in which the prosecutor may argue for, and the jury convict of, aggravated assault based on*

---

5       When *Aguilar* was decided, assault with a deadly weapon and force-likely assault were both contained in subdivision (a)(1) of former section 245. (*Aguilar*, *supra*, 16 Cal.4th at p. 1028.) The Legislature subsequently split them into subdivisions (a)(1) and (a)(4), respectively. (Stats. 2011, ch. 183, § 1; see *People v. Brunton* (2018) 23 Cal.App.5th 1097, 1104, rehg. den. June 11, 2018, petn. for review pending, petn. filed July 5, 2018 (*Brunton*).) As we explain below, this legislative amendment does not alter our analysis.

10

*the mere character of the weapon*."  (*Aguilar*, *supra*, 16 Cal.4th at p. 1037, fn. 10, italics added.)

Justice Mosk wrote a concurring opinion synthesizing the *Aguilar* majority's reasoning:

> "[Section 245] punishes an assault committed either (1) with a 'deadly weapon or instrument' other than a firearm or (2) by means of any 'force likely to produce great bodily injury.'  [¶]  In turn, a 'deadly weapon or instrument' is either (1) a weapon that is deadly per se (e.g., a dagger) or (2) any 'object, instrument, or weapon' that is *used* in a way likely to produce death or great bodily injury (e.g., a hammer).  [Citations.]  [¶]  Reading this definition back into the statute, we find that section 245 . . . thus actually punishes an assault committed in any one of three ways: i.e., (1) with a weapon deadly per se, or (2) with an *object used* in a way likely to produce great bodily injury, or (3) by means of a *force* also likely to produce great bodily injury."  (*Aguilar*, *supra*, 16 Cal.4th at p. 1038 (conc. opn. of Mosk, J.).)

*Aguilar*'s distinction between inherently and noninherently deadly weapons is reflected in CALCRIM No. 875's definition of "deadly weapon," which states:  "A *deadly weapon other than a firearm* is any object, instrument, or weapon that is [1] inherently deadly or [2] one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury."

Applying these principles, we conclude force-likely assault is not a lesser included offense of assault with a deadly weapon because, although every force-likely assault must be committed in a way that is likely to produce great bodily injury (either with or without a deadly weapon), there is a subset of assaults with deadly weapons—those committed with inherently deadly weapons—that are not necessarily likely to produce great bodily injury.  The Attorney General posits the following illustration:

11

"For example, if a defendant cuts a single strand of a sleeping person's hair with an inherently dangerous weapon such as a dagger, he will have committed assault with a deadly weapon even if no evidence shows he used the dagger in a manner capable of causing or likely to cause death or great bodily injury. Although a defendant must do an act 'that by its nature would directly and probably result in the application of force to a person' (CALCRIM [No.] 875), the 'terms *application of force* and *apply force* mean to touch in a harmful or offensive manner. The slightest touching can be enough if it is done in a rude or angry way.' (*Ibid*.) Moreover, the 'People are not required to prove that the defendant actually touched someone.' (*Ibid*.)" (Italics added.)

Aguayo maintains we are not bound by *Aguilar* because its discussion of inherently deadly weapons is merely dicta and it addressed an earlier version of section 245. We agree *Aguilar* is not *binding*, but we find its analysis highly persuasive because of the depth in which the court analyzed the interplay between deadly weapons and the use of force likely to produce great bodily injury. (See *People v. Brown* (2000) 77 Cal.App.4th 1324, 1336 ["even dictum from our Supreme Court is considered 'highly persuasive' "].) And although section 245 was amended post-*Aguilar* to separate assault with a deadly weapon and force-likely assault into separate subdivisions, our court previously explained that "the Legislature made clear it was making only 'technical, nonsubstantive changes' to section 245 (Legis. Counsel's Dig., Assem. Bill No. 1026 (2011-2012 Reg. Sess.)) to provide clarity for purposes of recidivist enhancements . . . ." (*Brunton*, *supra*, 23 Cal.App.5th at p. 1107.)

Aguayo relies heavily on *In re Jonathan R.* (2016) 3 Cal.App.5th 963, which concluded force-likely assault *is* a lesser included offense of assault with a deadly weapon. (*Id.* at pp. 971-972.) We decline to follow *Jonathan R*. First, it focuses

12

primarily on noninherently deadly weapons, relegating to a single footnote its discussion of *Aguilar*'s recognition of inherently deadly weapons. (*Jonathan R.*, at pp. 971-974 & fn. 5.) In that footnote, the *Jonathan R.* court concludes that the use of inherently deadly weapons "necessarily involves the use of force likely to produce death or serious injury" because they " 'are "dangerous or deadly" to others in the *ordinary use* for which they are designed.' " (*Id.* at p. 973-974, fn. 5, italics added.) But as the Attorney General's example illustrates, there are *nonordinary uses* to which one can put an inherently deadly weapon (e.g., cutting a single strand of hair) without altering the weapon's inherently deadly character.[6] Second, as our court previously explained in *Brunton*, due to intervening California Supreme Court authority, we place less weight on the intervening amendment to section 245 than did the *Jonathan R.* court. (See *Brunton*, *supra*, 23 Cal.App.5th at pp. 1106-1107.)

Aguayo argues we should follow *Jonathan R.* here because a different panel of our court applied it in an admittedly different context in *In re Jose S.* (2017) 12 Cal.App.5th 1107. We are not persuaded. In *Jose S.*, a former ward of the juvenile court sought to seal his juvenile criminal record, which included an admission of assault with a deadly weapon (a knife). (*Id.* at p. 1112.) The juvenile court concluded his record was ineligible for sealing because his assault conviction was a disqualifying offense under the statutory sealing scheme. (*Id.* at p. 1112-1113.) On appeal, the appellant argued (for the first

---

6    By analogy, an individual can commit an assault with a semiautomatic firearm (§ 245, subd. (b)) even if the firearm is unloaded and used as a mere bludgeon. (See *People v. Miceli* (2002) 104 Cal.App.4th 256, 270.)

13

time) his assault conviction was not disqualifying because the sealing statute enumerated assault with a firearm and force-likely assault, but not assault with a deadly weapon (the offense he admitted). (*Id.* at p. 1121.) In rejecting this argument, our court noted the juvenile court was authorized to consider not only the allegations of the charging document, but also the facts and circumstances of the actual offense. (*Id.* at p. 1122.) In that light, our court concluded the juvenile court was justified in concluding the defendant's assault with a deadly weapon "amounted to" and "encompasse[d]" force-likely assault because the evidence supported the factual finding that "[t]he knife used by [the minor] was capable of causing, and did cause, great bodily injury." (*Id.* at pp. 1122-1123.) In that sense, the manner in which the minor committed the assault with a deadly weapon was also likely to produce great bodily injury and, thus, was tantamount to a force-likely assault.

Here, unlike in *Jose S.,* we are not authorized to consider the facts and circumstances of the offense. Rather, we must apply the elements test "in the abstract," without regard to the "evidence introduced at trial." (*Chaney*, *supra*, 131 Cal.App.4th at p. 256.) Thus, *Jose S.* is inapposite.

In sum, because an assault can be committed with an inherently deadly weapon without necessarily using force likely to produce great bodily injury, force-likely assault is not a lesser included offense of assault with a deadly weapon.

In her reply brief, Aguayo raises for the first time the alternative argument that even if we conclude (as we have) that force-likely assault is not a lesser included offense of assault with a deadly weapon, we must nonetheless vacate her conviction for force-

14

likely assault because it is based on the same act as the assault with a deadly weapon conviction. This argument fails for several reasons. First, "[o]rdinarily, we do not consider arguments raised for the first time in a reply brief." (*People v. Mickel* (2016) 2 Cal.5th 181, 197.) Aguayo has given us no reason to depart from this practice. Second, Aguayo has not sufficiently developed the argument or supported it with citations to supporting legal authority. (See *In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 690, fn. 18 [failure to develop an argument or cite any authority in support of a contention results in the forfeiture of the issue on appeal].) Finally, the only case Aguayo cites in support of her argument, *Brunton*, *supra*, 23 Cal.App.5th 1097, is readily distinguishable. There, our court concluded convictions for force-likely assault and assault with a deadly weapon were impermissibly duplicative because they were both based on the defendant's *single act*—"choking his cellmate with a tightly rolled towel." (*Id.* at p. 1099.) Here, however, Aguayo's convictions are based on *multiple acts*—hitting her father with the bicycle chain and lock, and hitting him with the ceramic pot.

## II. *Retroactivity of the Mental Health Diversion Statutes*

Aguayo contends the newly enacted mental health diversion statutes apply retroactively and that she has made a factual showing of potential eligibility sufficient to warrant a remand. We agree.

### A. *Retroactivity*

#### 1. *The Diversion Legislation*

"Generally, pretrial diversion is the suspension of criminal proceedings for a prescribed time period, subject to certain conditions. (See, e.g., §§ 1000.1 [diversion for

15

specified drug offenses], 1001.60 [bad check diversion], 1001.70 [parental diversion], 1001.80 [military diversion].)  Ordinarily, when a defendant successfully completes a diversion program, the criminal charges are dismissed and the defendant may legally answer that he or she has never been arrested for—or charged with—the diverted offense, subject to certain exceptions.  (See also, e.g., §§ 1001.9, 1001.33, 1001.55.)"  (*Frahs*, *supra*, 27 Cal.App.5th at p. 788, rev. gr.)

Effective June 27, 2018, as part of a larger health care bill, the Legislature added two new sections to the Penal Code (§§ 1001.35, 1001.36) that authorize trial courts to grant "pretrial diversion" to defendants diagnosed with qualifying mental disorders.  (See Stats. 2018, ch. 34, § 24.)  The statutes define "pretrial diversion" as "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment," provided the defendant satisfies certain eligibility prerequisites.  (§ 1001.36, subd. (c).)

Section 1001.35 sets forth the legislative purpose of "promot[ing] all of the following:  [¶]  (a)  Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety.  [¶]  (b)  Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings.  [¶]  (c)  Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders."

Section 1001.36 gives trial courts the discretion to grant pretrial diversion if the court finds the following eligibility criteria are satisfied: (1) a qualified mental health expert has recently diagnosed the defendant with a qualifying mental disorder; (2) the "mental disorder was a significant factor in the commission of the charged offense"; (3) the defendant's symptoms will respond to treatment; (4) the defendant consents to diversion and waives his or her speedy trial rights; (5) the defendant agrees to comply with treatment; and (6) the defendant will not pose an unreasonable risk of danger to public safety if treated in the community. (§ 1001.36, subd. (b)(1)(A)-(F).)[7]

If the court grants pretrial diversion, "[t]he defendant may be referred to a program of mental health treatment utilizing existing inpatient or outpatient mental health resources" for "no longer than two years." (§ 1001.36, subds. (c)(1)(B) & (c)(3).) If the defendant performs "satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion." (§ 1001.36, subd. (e).) A "defendant who successfully completes diversion may indicate in response to any question concerning his or her prior criminal record that he or she was not arrested or diverted for

---

[7] Shortly after section 1001.36 was enacted, it was amended to (1) eliminate a defendant's eligibility if the defendant committed certain offenses; (2) allow the trial court "[a]t any stage of the proceedings" to "require the defendant to make a prima facie showing that the defendant will meet the minimum requirements of eligibility for diversion and that the defendant and the offense are suitable for diversion"; and (3) to make certain technical changes (e.g., changing the phrase "*played* a significant *role*" to "*was* a significant *factor*" [italics added]). (Stats. 2018, ch. 1005 (Sen. Bill No. 215), § 1, eff. Jan. 1, 2019.) These amendments have no bearing on the issues in this appeal.

17

the offense," except in connection with applying for employment as a peace officer. (§ 1001.36, subds. (e), (g)(1).)

## 2. *Retroactivity Principles*

Criminal statutes are generally presumed to apply prospectively, unless they indicate otherwise. (§ 3; *In re Estrada* (1965) 63 Cal.2d 740, 745 (*Estrada*); *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 307 (*Lara*).) In *Estrada*, however, the Supreme Court concluded the presumption against retroactivity does not apply when the Legislature reduces the punishment for a particular crime. (*Estrada*, at pp. 744-745.) " 'The *Estrada* rule 'rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' " (*Lara*, at p. 308; see *Estrada*, at p. 745 ["When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply."].)

Although the *Estrada* rule arose in the context of ameliorating the punishment for a *particular crime* (*Estrada*, *supra*, 63 Cal.2d at pp. 743-744 [escape without force or violence]), the Supreme Court in *Lara* concluded the rule likewise applies when the Legislature "ameliorate[s] the possible punishment for a *class of persons*" (*Lara*, *supra*, 4

18

Cal.5th at p. 308, italics added).  Thus, the *Lara* court held that Proposition 57, which generally eliminated a district attorney's discretion to file criminal charges against a juvenile in "adult" criminal court, applied retroactively because " 'for a minor accused of a crime, it is a potential "ameliorating benefit" to have a neutral judge, rather than a district attorney, determine that he or she is unfit for rehabilitation within the juvenile justice system.' "  (*Lara*, at p. 308.)  The court reasoned *Estrada*'s inference of retroactivity applied because "[n]othing in Proposition 57 itself or the ballot materials rebuts this inference."  (*Lara*, at p. 309.)

### 3. *Analysis*

Section 1001.36 is undeniably potentially ameliorative to the class of persons who meet its eligibility requirements.  If an eligible defendant successfully completes diversion, the court will dismiss his or her criminal charges, and he or she can generally say "he or she was not arrested or diverted for the offense."  (§ 1001.36, subds. (e), (g)(1).)  Thus, under the *Estrada* rule, section 1001.36 applies retroactively, "in the absence of contrary indications."  (*Lara*, *supra*, 4 Cal.5th at p. 308.)

The Attorney General contends section 1001.36 contains contrary indications—the statute uses the phrase "*pretrial* diversion," the definition of which indicates it applies "until adjudication," which occurs before appeal.  (§ 1001.36, subd. (c), italics added.)  The Attorney General contends these phrases are tantamount to a legislative expression of intent that the statute not apply retroactively.  We are not persuaded.  Nor was the court in *Frahs*, *supra*, 27 Cal.App.5th at page 791, which rejected the same argument with the following explanation:

19

"The fact that mental health diversion is available only up until the time that a defendant's case is 'adjudicated' is simply how this particular diversion program is ordinarily designed to operate. Indeed, the fact that a juvenile transfer hearing under Proposition 57 ordinarily occurs prior to the attachment of jeopardy, did not prevent the Supreme Court in *Lara*, *supra*, 4 Cal.5th 299, from finding that such a hearing must be made available to all defendants whose convictions are not yet final on appeal."[8]

Furthermore, the California Supreme Court decided *Lara* before the Legislature passed section 1001.36. The Legislature is deemed to have been aware of the decision and its impact on legislation that potentially ameliorates punishment for an entire class of persons. (See *People v. Overstreet* (1986) 42 Cal.3d 891, 897 ["[T]he Legislature is deemed to be aware of existing laws and judicial decisions in effect at the time legislation is enacted and to have enacted and amended statutes ' "in the light of such decisions as have a direct bearing upon them." ' "].)

The Attorney General also cites the legislative history of sections 1001.35 and 1001.36 to support the proposition that they were enacted for budgetary reasons rather than to benefit offenders with mental disorders. Although we granted the Attorney General's request to take judicial notice of these materials, we find it unnecessary to refer to them in discerning the Legislature's intent because section 1001.35 unambiguously expresses the statutes' purpose. Moreover, sections 1001.35 and 1001.36 were only a small part of the legislation to which the historical materials relate (see Stats. 2018, ch.

---

8    Although the California Supreme Court granted review in *Frahs* on its own motion, we may (and do) cite *Frahs* for its persuasive value. (Cal. Rules of Court, rule 8.115(e)(1).)

34, §§ 1-32), and the Attorney General has not persuaded us that budgetary considerations addressed in the materials refer to section 1001.36.

Because section 1001.36 is potentially ameliorative to an entire class of persons, and because the statute does not express a legislative intent that it be applied only prospectively, we conclude the *Estrada* rule applies to section 1001.36 such that it must be applied retroactively to any eligible defendant whose judgment is not final.

### B. *Sufficient Showing*

Having concluded section 1001.36 applies retroactively, we must now determine whether Aguayo has made a showing of potential eligibility sufficient to warrant a remand. Aguayo argues no showing of potential eligibility is required on appeal, or, alternatively, that we should presume remand is appropriate "unless the record is clear the [trial] court would not exercise [its] newly-created discretion." She maintains it "would be fundamentally unfair" to require her to make the same eligibility showing on appeal that would have been required in the trial court because "[t]here would have been no reason to make any record showing eligibility in the trial court before the new statutes were enacted."

The Attorney General counters that "remand should not be required until a defendant makes at least a prima facie showing" under *all* the eligibility criteria set forth in section 1001.36, subdivision (b). Otherwise, the Attorney General reasons, reviewing courts will "be required to remand *all* cases that were not final in June 2018 [when the mental health diversion statutes took effect] unless there is affirmative evidence in the record establishing that the defendant was ineligible for mental health diversion."

21

We need not determine in the abstract the precise evidentiary showing required to warrant a remand because we are satisfied there is sufficient evidence in this record to support Aguayo's argument she can make a prima facie showing of eligibility on remand. (We express no view on whether she ultimately will be able to do so.)

First, the record suggests Aguayo may suffer from a qualifying mental disorder. She told her probation officer she "was diagnosed with Post Traumatic Stress Disorder (PTSD)" in 2010 and "is *currently* prescribed Cymbalta and Zyprexa" (italics added), which are used to treat depression, anxiety disorder, schizophrenia, and bipolar disorder.[9] Section 1001.36 lists PTSD, schizophrenia, and bipolar disorder as specific examples of qualifying mental disorders. (§ 1001.36, subd. (b)(1)(A).)

Second, the record suggests Aguayo's possible mental disorders were "a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b)(1)(B).) Indeed, the trial court stated at sentencing that it "believe[d] the offense was committed *because of* a mental condition that aggravated [Aguayo's] behavior." (Italics added.)

Finally, the sentence the trial court imposed suggests the court may have been willing to place Aguayo into mental health diversion had it been an available option. That is, even though Aguayo was presumptively ineligible for probation and the

---

[9] Cymbalta "is used to treat depression and generalized anxiety disorder." (https://medlineplus.gov/druginfo/meds/a604030.html [as of January 17, 2019].) Zyprexa "is used to treat the symptoms of schizophrenia" and "to treat bipolar disorder." (https://medlineplus.gov/druginfo/meds/a601213.html [as of January 17, 2019].)

probation officer "adamantly believe[d] probation is not appropriate in this case," the trial court nonetheless granted Aguayo probation based (in part) on her untreated mental health issues.

Again, we express no view on whether Aguayo ultimately will be able to make a prima facie showing of eligibility on remand. Nor do we express any view on how the trial court should exercise its discretion if the court finds her eligible. We grant remand merely to effectuate the stated legislative purpose of promoting "[i]ncreased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety." (§ 1001.35, subd. (a).)

## DISPOSITION

The judgment is conditionally reversed. The cause is remanded to the trial court with directions to conduct a diversion eligibility hearing under section 1001.36.

If the trial court determines Aguayo is not eligible for diversion, then the court shall reinstate the judgment.

If the trial court determines Aguayo is eligible for diversion but, in exercising its discretion, the court further determines diversion is not appropriate under the circumstances, then the court shall reinstate the judgment.

If the trial court determines Aguayo is eligible for diversion and, in exercising its discretion, the court further determines diversion is appropriate under the circumstances, then the court may grant diversion. If Aguayo successfully completes diversion, the court shall dismiss the charges in accordance with section 1001.36, subdivision (e).

23

However, if Aguayo does not successfully complete diversion, then the trial court shall reinstate the judgment.

HALLER, Acting P. J.

WE CONCUR:

IRION, J.

DATO, J.